No. 23-4308

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

(1:22-cr-00165-MSN-1)
_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

HATCHET M. SPEED

Defendant - Appellant
_____

Appeal from the United States District Court
for the Eastern District of Virginia, (Hon. Michael S. Nachmanoff, District Judge)

OPENING BRIEF OF APPELLANT HATCHET M. SPEED

SUBMITTED BY:

Edward Andrew Paltzik
Bochner PLLC
1040 Avenue of the Americas,
15th Fl.
New York, New York 10018
(516) 526-0341
edward@bochner.law

# TABLE OF CONTENTS

I.    JURISDICTIONAL STATEMENT ................................................................. 7

II.    STATUES INVOLVED ................................................................................ 7

III.    STATEMENT OF ISSUES ........................................................................ 7

IV.    STATEMENT OF THE CASE .................................................................... 9

    A.   The FBI's undercover agent ................................................................ 11

    B.   The District Court's pretrial rulings ...................................................... 12

    C.   The "A Silencer Need Not be Operable" instruction ...................................... 13

    D.   The instructions were designed to thwart Speed's defense ........................... 14

    E.   The Court's preclusion of evidence regarding the commercial availability of Speed's devices and of solvent traps at Speed's local gun store ................................... 14

    F.   Objections were preserved ................................................................ 15

    G.   The Second Trial - The Government's own expert testified that a half dozen steps would be required to modify Speed's devices into silencers ................................... 16

V.    SUMMARY OF THE ARGUMENT .......................................................... 19

    A.   The evidence was insufficient for conviction ............................................. 20

    B.   The District Court's false construction of a "Mistake of Law" ...................... 21

    C.   The District Court improperly construed Speed's statement of knowledge and intent about his solvent traps to be a forbidden "Mistake of Law" defense ........................... 22

    D.   Possession of an unregistered silencer under the National Firearms Act is a specific-intent crime; and a mistake of law defense is generally permitted for such crimes ................................................................................................. 22

    E.   Improper jury instructions watered down the requirements for conviction ................. 23

    F.   The District Court wrongly applied Rule 403 balancing to preclude Speed's relevant, probative statements, thus depriving Speed of his primary defense ……………............... 24

    G.   The Statute(s) are void for vagueness as applied to Speed's case .................................. 25

H.   Even if Speed possessed actual, true silencers, such possession is protected under the Second Amendment ............................................................................................. 25

VI.   ARGUMENT .................................................................................................... 26

A.   The District court erred in classifying evidence that Speed believed his devices did not qualify as silencers needing registration as a "Mistake of Law" ……………….............. 26

i.   The *Crooker* decision ................................................................................ 28

ii.   *Crooker*'s conclusion that different levels of *mens rea* apply to each prong of 921(A)(25)'s definition ............................................................................ 29

iii.   *Staples* does not support the District Court's evidentiary rulings but actually supports Speed's defense ......................................................................... 30

iv.   The District Court wrongly applied Rule 403 balancing to preclude Speed's relevant, probative statements which pertained to Speed's primary defense .......................... 34

v.   The excluded statements concealed from the jury the fact that Speed had no intent to make modifications to the solvent trap devices (unless Speed first submitted proper paperwork) ...................................................................................... 36

B.   The jury instructions misstated the law by overemphasizing the physical features of devices rather than Speed's intent, while stressing that the physical feature requirements were very relaxed ...................................................................................... 37

i.   The District Court's jury instructions emphasized both that jurors should focus on the design features of Speed's devices but that the devices needn't be operable for conviction ...................................................................................... 37

ii.   The District Court's "Silencer-Need-Not-Be-Operable" Instruction was not an accurate statement of the law, especially as applied to Speed's devices, which required actual modifications to convert to silencers .......................................................... 38

C.   The Evidence was insufficient for conviction................................................. 39

i.   Speed's devices were not silencers, under any test................................... 39

ii.   Speed's devices could not be "assembled" into a silencer without modification or fabrication ...................................................................................... 40

iii.   The statutory definition of a "silencer" excludes multifunctional items …….......... 41

D.  The statute is unconstitutionally void for vagueness as applied ...................................... 44

   i.     ATF Regulations did not give Speed fair notice ......................................................... 44

E.  Alternatively, even if Speed's devices were silencers, the Second Amendment protects such possession.......................................................................................................... 47

VII.    CONCLUSION ...................................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**

*Beckles v. United States*,
  580 U.S. 137 S. Ct. 886 (2017)…………………….…………........................... 48

*Bond v. United States*,
  572 U.S. 844 (2014)……………………………….……………........................ 47

*Bouie v. City of Columbia*,
  378 U.S. 347 (1964)……………………………………….……………………… 45

*Caldwell v. Mississippi*,
  472 U.S. 320 (1985)……………………………………….……………………… 38

*City of Chicago v. Morales*,
  527 U.S. 41 (1991)……………………………….…………………………….. 47

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)…………………………...……………….……… 48, 49

*Holloway AKA Ali v. United States*,
  526 U.S. 1 (1999)…………………………...…………………………….. 36

*Innovator Enters., Inc. v. Jones*,
  28 F. Supp. 3d 14 (D.C. Cir. 2014)…………………………………… 28, 43

*Lambert v. California*,
  355 U.S. 225 (1958)……………………………...…………………….... 46

*Lassiter v. Dep't of Soc. Srvcs.*,
  452 U.S. 18 (1981)………………..………………………..……… 38

*Liparota v. United States*,
  471 U.S. 419 (1985)……………….................................................. 21, 25, 28

*Nobles v. Commonwealth*,
  238 S.E.2d 808 (1977)………………………………...........................….. 37

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  142 S. Ct. 2111 (2022)………………………....................................................*passim*

*Rabe v. Washington*,
  405 U.S. 313 (1972)……………………………………...………………..……… 46

*Ruan v. United States*,
    142 S.Ct. 2370 (2022)……………………………..…………………………….. 21, 25

*Staples v. United States*,
    511 U.S. 600 (1994)……………………………..………………………… *passim*

*United States v. Syverson*,
    90 F.3d 227 (7th Cir. 1996)……………..…………..……………………..…… 20

*United States v. Klebig*,
    600 F.3d 700 (7th Cir. 2010)………………………………..……..……….. 20

*United States v. Crooker*,
    608 F.3d 94 (1st Cir. 2010)……………………..…………….…..…..…… *passim*

*United States v. Kenyon*,
    481 F.3d 1054 (8th Cir. 2007)…………………….…..……………..……..….. 27

*United States v. Hayden*,
    64 F.3d 126 (3d Cir. 1995)……………………………….…………………….. 27

*United States v. Curran*,
    20 F.3d 560 (3d Cir. 1994)……………………………………………… 27

*United States v. Grigsby*,
    111 F.3d 806 (11th Cir. 1997)…………………....……………………….... 27

*United States v. Rhone*,
    864 F.2d 832 (D.C. Cir. 1989)……………………………………….....…. 27

*United States v. Webb*,
    975 F. Supp. 1280 (D. Kan. 1997)……………………………………....…. 34

*United States v. Finestone*,
    816 F.2d 583 (11th Cir. 1987)………………….…………………..…….…... 35

*United States v. Dennis*,
    625 F.2d 782 (8th Cir. 1980)……………………………………....……. 35

*United States v. Moore*,
    732 F.2d 983 (D.C. Cir. 1984)………………………………………… 35

*United States v. Jamil*,
    707 F.2d 638 (2d Cir. 1983)…………………………………...……….... 35

*United States v. Brady*,
    595 F.2d 359 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 (1979))……………….….….. 35

*United States v. Betancourt*,
    734 F.2d 750 (11th Cir. 1984)………………………...……………………….... 35

*United States v. King*,
    713 F.2d 627 (11th Cir. 1983), *cert. denied*, 466 U.S. 942 (1984)…………………... 35

*United States v. Coffell*,
    720 F. App'x 521 (11th Cir. 2017)…………...……………...…………………...….. 39

*United States v. Carter*,
    465 F.3d 658 (6th Cir. 2006)……………………………….........…………………..... 39

*United States v. Morningstar*,
    456 F.2d 278 (4th Cir.), *cert. denied*, 409 U.S. 896 (1972)…………...……..... 41, 44, 45

*United States v. Harriss*,
    347 U.S. 612 (1954)…………………………………….…………………… 41, 45, 49

*United States v. Thompson Center Arms Company*,
    504 U.S. 505 (1992)………………...………………………………………….….... 42

*United States v. Thompson*,
    82 F.3d 849 (9th Cir. 1996)…………………………………………...……….. 42

*United States v. Alexander*,
    480 F. Supp. 3d 988 (N.D. Cal. 2020)………………………………………….,,…..... 42

*United States v. Malone*,
    546 F.2d 1182 (5th Cir. 1977)……………………………………………...…... 43

*United States v. Blackburn*,
    940 F.2d 107 (4th Cir. 1991)…………………...………………...…………… 43

*United States v. Posnjak*,
    457 F.2d 1110 (2d Cir. 1972)…………………...………………………...….. 43

*United States v. Hoechst Celanese Corp.*,
    128 F.3d 216 (4th Cir. 1997)………………………………………………….... 45

*United States v. Schrum*,
    346 F. Supp. 537-38 (E.D. Va. 1972)……………………………………...………… 47

*United States v. Apel*,
    134 S. Ct. 1144 (2014)…………………...………..………………………….…… 48

*Watts v. United States*,
    394 U.S. 705 (1969)…………………….………………………………...…… 36

**Statutes**

26 USC § 5841………………………………...……………………………………... 46

26 USC § 5861(d)………………………………………..…………………… *passim*

26 USC § 5871……………………………………………………………………… 9

18 USC § 921(a)…………………………………….………………………….…... *passim*


**Other Authorities**

A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense*, 97 Marq. L. Rev. 853 (2014)…………………….……..……………… 50

Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273 (2022)……...…………….. 51

Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 69 (2016)………………….…………..…… 50

Jack Weinstein & Margaret A. Berger, Weinstein's Evidence (1986)……………..……... 25

## I.    **JURISDICTIONAL STATEMENT**

This is an appeal from a federal criminal judgment of conviction in the District Court for the Eastern District of Virginia. The District Court (Hon. Michael S. Nachmanoff, U.S.D.J.) had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231 (the district courts of the United States shall have original jurisdiction over all offenses against the laws of the United States). A timely notice of appeal having been filed on April 28, 2023, from the final judgment of conviction entered on April 13, 2023, this Court has jurisdiction pursuant to 28 U.S.C. § 1291 (the courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the Circuit).

## II.    **STATUTES INVOLVED**

26 U.S.C. § 5841 (registration of firearms), 5861(d) (prohibited acts), and 5871 (penalties); 18 U.S.C. § 921(a)(25) (definition of firearm silencer).

## III.    **STATEMENT OF THE ISSUES**

I.      Whether the devices possessed by Speed were silencers under the definition found at 18 U.S.C. § 921(a)(25).

II.      Whether the District Court improperly precluded the jury from hearing Speed's innocent intent on "mistake of fact" grounds.

III.      Whether the District Court's jury instructions—which directed jurors away from Speed's mental state, toward the features of

Speed's device, and then emphasizing that such features don't need to be operable—were proper.

IV.     Whether the statutes in question are void for vagueness as applied to Speed.

V.      Whether the Second Amendment protects possession of silencers, given the Supreme Court's recent landmark holding in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

## IV.   <u>STATEMENT OF THE CASE</u>

Possession of an unregistered firearm silencer has been a federal crime since the 1930s. But in all the history of federal enforcement, the silencers at issue could at least muzzle or suppress firearm noise; or could be assembled into silencers that could do so. This case presents an issue of first impression, involving mere possession of metal gun-cleaning containers which would have required removal of parts and then drilling *to become* silencers.

In 2021, Appellant Hatchet M. Speed ("Speed"), a software developer, gun enthusiast, and Naval reservist from Vienna, Virginia, purchased three metal solvent traps marketed by Hawk Innovative Technologies ("HIT"), from the company's website. JA 1158. Such solvent particulate filters were of a type sold online and at gun stores nationwide. Such solvent traps are marketed and used to help gun users clean their guns by threading the devices onto the ends of gun

barrels to capture gun-cleaning solvents drained from the barrels. Speed's solvent trap devices were still in their original boxes. JA 1157-1158.

Each box contained a paper insert plainly saying "The HIT solvent filter/recycler is designed, manufactured, assembled, and sold for the intended purposes as a cleaning device or as a dry container storage," and "Use only as intended." JA 1076-1077.

On September 6, 2022, the Government indicted Speed, alleging Speed's devices were unregistered "silencers." At Speed's trial, a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") expert testified that a gun user *could* convert the HIT solvent filters into unregistered silencers by drilling holes in the bottoms of the containers and removing certain parts. Yet, searches of Speed's storage unit (where the filters were found) and residence revealed no drill, drill press, drill bit, or vice needed to modify such devices into firearm silencers. JA 1095, 1166.

## A.     The FBI's undercover agent

The case against Speed was developed by use of an undercover FBI agent ("Al"), who befriended Speed at a Virginia coffee shop. At the direction of FBI superiors, Al spent weeks of 2021 and 2022 trying to develop criminal evidence against Speed. Al secretly recorded conversations in which Al initiated talk about silencers and solvent traps. JA 1229. Al mentioned seeing a YouTube video about

a way to circumvent suppressor laws by converting solvent filters into suppressors. JA 1229. It was in response to this that Speed told Al that he owned three solvent filters (Speed never described his HIT devices as "silencers"). *Id.*

Later, Al asked Speed if the solvent traps might "come in handy" during a hypothetical civil war or collapse of society, and if the objects might then be drilled and fabricated into silencers. JA 1232. Speed's response was, "Yeah, yeah, that's the idea." *Id.* Speed never expressed any intent to ever modify the devices in any way. JA 1232. In fact, Speed said if he ever intended to do so he would need to "find someone" with a drill press. JA 0859.

Speed was aware of silencer registration requirements. Speed told Al that "if you drill [into the solvent trap] and you don't submit the Form One, then now you're a felon." JA 0657. Speed, in fact, owned three actual, functioning, silencers that were properly registered in his name in the National Firearm Transfer Record. Speed was aware of the National Firearms Act ("NFA") registration process and had a record of complying with it.

## B.    The District Court's pretrial rulings

In pretrial motions and hearings, the Government sought to "exclude evidence of Mr. Speed's subjective understanding of the operability of the Hawk Innovative devices and . . . his subjective understanding of the time to register" the

devices. JA 0355-0356.[1]  The Government claimed such statements were an improper "mistake of law" defense. JA 0358. "Even if this evidence had some marginal probative value about Speed's knowledge of the design features of the devices," according to Assistant United States Attorney ("AUSA") Traxler, "we still believe that this evidence should be excluded under Rule 403." JA 0357. "The mistake of law inferences that are baked into this evidence are simply too great." *Id.* "It's going to confuse the jury and, potentially, mislead them into believing that Speed should be absolved because he was mistaken." *Id.*

The District Court granted the Government's motions *in limine*, precluding Speed's prior statements regarding his devices:

> THE COURT: Yes. And the Court finds, consistent with the case law, that that cannot be a proper defense in this case. The government bears the burden of proof beyond a reasonable doubt as to all elements, but the Court cannot permit a defense which is contrary to the law, and **a mistake of law defense is prohibited in this case.** JA 0363-0364 (emphasis added).

### C.    The "A Silencer Need Not be Operable" instruction

The District Court adopted the Government's arguments, even imposing jury instructions which directed jurors away from Speed's state of mind and directed that jurors "should focus on the objective design features of the device." JA 0812.

---

[1] Dec. 7, 2022.

The District Court also granted the government a new, special, jury instruction—entitled the *"A Silencer Need Not Be Operable"* jury instruction:

> Under this test, a device does not need to be operable to constitute a silencer, as long as the purpose of the device is to silence, muffle, or diminish the report of a portable firearm. In determining whether the purpose of a device is to silence, muffle, or diminish the report of a portable firearm, you should focus on the objective design features of the device. JA 0812.

Again, this was over Speed's objection that this additional emphasis was "unnecessary clarification" and that "the Court may be placing its finger on the scale in favor of the government here." JA 0348. The jury was effectively instructed *twice* on this point because the legal definition of "firearm silencer," §921(a)(25) already defined a silencer to include "any combination of parts." 18 US.C. § 921(a)(25)

## D.    The instructions were designed to thwart Speed's defense

The District Court's jury instructions, with added emphasis on not needing proof of functionality, emphasized both a low level of awareness required to convict Speed, and an expansive conception of what a jury could call a silencer.

> [PROSECUTORS]: And so the instruction helps the jury understand that a device could still be a silencer even if that final step hasn't been taken . . . And Mr. Speed, in his submissions, has already previewed for the Court that he intends to argue that the fact that it wasn't drilled through, that he had not obtained certain parts to do that drilling is indicative that this device was not a silencer. And so we believe that *in light of the facts of his intended defense,* this jury instruction is

very helpful for the jury in assessing whether these particular devices were silencers.
**Well, I'm going to overrule the defense's objection**. JA 0351(emphasis added).

The District Court instructed the jury to disregard any concept of silencer operability *twice*, specifically in order to thwart Speed's defense.

### E. The Court's preclusion of evidence regarding the commercial availability of Speed's devices and of solvent traps at Speed's local gun store

The district judge even granted the government's motion *in limine* precluding discussion of the fact that Speed's local gun store, the Vienna Arsenal, sold similar solvent traps over the counter. JA 0735. This was despite the fact that Speed's knowledge of the devices stemmed in part from knowledge of commercial availability. Speed's counsel argued that "if the shoe were on the other foot, like, if Speed was purchasing these devices in a back alley or somewhere else, that would be something that the government would seek to show. On the flip side, the fact that he purchased them on a site that was open at the time that he purchased them," was evidence relevant to Speed's knowledge. JA 0728.

But any evidence of commercial availability, according to Judge Nachmanoff:

> . . . goes to his mens rea, the ease with which he purchased them [which] does not answer the question as to whether or not he knew it had the characteristics of whether it was a silencer. That is the essence of this case, and I find that it is not relevant and it would be unfairly

prejudicial and potentially confuse the jury, and, therefore, I will grant the motion *in limine* to exclude evidence regarding JK Armament and the sale of these items from Vienna Arsenal as well as the sale of other types of so-called solvent traps that are available on the Internet. JA 0735.

The District Court allowed the Government to introduce, over Speed's objection, Speed's three functional, operational, properly registered silencers as supposed evidence that their designs were like the solvent traps. JA 0893. But the Court denied Speed's admission of Form 1 and Form 4, which showed Speed followed proper practices regarding registration of silencers. JA 1108-1109.

### F.     Objections were preserved

Speed's attorneys repeatedly sought to introduce the prior surreptitiously recorded remarks showing Speed's lack of criminal intent. Speed's counsel also objected repeatedly to the District Court's various near-strict-liability rulings and instructions. Speed's counsel at times framed Speed's objection as a request for a "willfully" *mens rea* jury instruction. *See, e.g.*, JA 0342-0343. 0345. At other times Speed's counsel characterized the required intent as "a stricter or higher standard" that must be met regarding the "combination of parts" prong of the silencer definition of 18 U.S.C. § 921(A)(25). JA 0344-0349. "[W]e submit that the defendant not only needed to know the characteristics of the firearm, but that the device that he, in fact, purchased fell within the statute." JA 0345.

The first trial in Speed's case ended in mistrial when the jury could not reach a verdict.[2] Between the first trial and the second trial, the government seized by forfeiture the website of HIT, allowing the government to say the company was no longer advertising its solvent traps for sale. JA 0269.

### G. The Second Trial - The Government's own expert testified that a half dozen steps would be required to modify Speed's devices into silencers

At Speed's trial, an ATF expert named Eve Eisenbise ("Eisenbise") testified that she had performed experiments to transform one of Speed's solvent traps into a silencer. This required Eisenbise to (1) remove the screw up in the top right-hand corner," which requires an Allen wrench (of which there was no evidence Speed possessed); (2) removed the "bolt holding parts to the front end cap;" (3) remove the baffle attached; (4) remove the spacers attached; (5) "pull out the screens; at a minimum, the thicker screen;" and (6) "finish drilling the indexed hole in the front end cap," using a drill (of which there was no evidence Speed possessed).[3] Then it was required that the parts be "reassembled." JA 1014-1016[4]

---

[2] Speed was originally tried for these offenses on December 12, 2022. ECF No. 87. JA 1214. On December 16, 2022, the Court declared a mistrial after the jury repeatedly indicated that it was deadlocked and unable to reach a verdict. ECF No. 93. JA 0641.

[3] Eisenbise testified that all it took was a "common hand drill;" nothing special, obtainable "at Home Depot or a hardware store." JA 1016.

[4] Note that on cross-examination, Eisenbise said there were actually eight (8) steps to modify the device into a silencer: (1) remove the screw from the end; (2) remove the extra pieces that were attached to the end; (3) take off that front end cap; (4)

Although Eisenbise testified and drilled out the end cap of one of Speed's three devices in under five minutes using a vice, the government mysteriously presented *no pictures or video of the transformation process*. Further, the jury was shown only pictures of these modifications in stages. *See, e.g.*, Ex. 52J (showing the drill). The ATF's expert testified that no true solvent trap would contain baffles. The court refused to allow the defense to impeach the witness with evidence of a patent application for a solvent trap with baffles. JA 1064.

Judge Nachmanoff's silencer-need-not-be-operational jury instruction empowered AUSA Traxler to repeat, again and again, the notion that the law criminalized Speed's mere possession of commercially sold solvent filters regardless of functionality or Speed's intent.

> Under the law, as the judge has instructed you, it does not matter that the indexing mark on the devices had to be drilled through for them to become fully functional. As the judge just instructed you a moment ago, in what will be Instruction No. 29, a device does not need to be operable to be a silencer under the law. Instead, the law requires only that the purpose of the device be to silence or diminish or muffle the sound of a firearm.
> JA 1135-1136.

> As I mentioned earlier, under the law, it doesn't matter that the hole in the front end cap needed to be drilled further for the devices to

remove all of the baffles, screens, spacers, and washers that were inside of the tube (or at least remove the screens); (5) then you put the front end cap into a vise; (6) use a hand drill to go through the front end cap hole; (7) then you replace the baffles and the spacers; (8) leaving out the screens "because screens have no purpose in a silencer" but "could be used to filter out solvent. JA 1082-1083.

become fully functional, because a silencer does not have to be operable to be a silencer under the law.
JA 1144.

So under the law, these devices were silencers even if they required a minor tweak in the front end cap in completing the premarked hole.
JA 1145.

I want to emphasize to you again what the judge instructed you about the law in this matter. As you heard, this is an inconsequential fact under the law. The judge instructed you that a device does not need to be functional to be a silencer, and I will repeat, a device does not need to be operable to be a silencer.
JA 1178.

The second jury deliberated for two hours before delivering a verdict of guilty on all three counts. JA 1219. Speed renewed his arguments in a motion for new trial on March 6, 2023, which was denied. *Id*. The judge also denied motions to dismiss the indictment for vagueness, and a Rule 29 motion for acquittal. JA 1098. Speed was ultimately sentenced to three years imprisonment.

Speed now appeals his judgment of conviction, these pretrial rulings, these jury instructions, the denial of the motion for acquittal, and the denial of his motion for new trial.

## V.    SUMMARY OF THE ARGUMENT

This case presents an issue of first impression, involving mere possession of metal gun-cleaning containers which would have needed to be drilled and modified to become silencers.

It is possible that almost any inanimate object could be converted into a firearm silencer if enough alterations or fabrications were done to it.[5] The silencer definition found at 18 U.S.C. § 921(A)(25) applies to "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler." 18 U.S.C. § 921(A)(25). Thus, until this case, every federal court has interpreted the silencer "combination of parts" definition to apply only to parts that can be assembled into a silencer, and not parts needing alterations combined with assembly. *See e.g.*, *United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010); *United States v. Klebig*, 600 F.3d 700, 704 (7th Cir. 2010) (reversing conviction where the silencer consisted of an oil filter taped to the end of the barrel of a rifle where the trial had been tinged with overly prejudicial evidence). Never before has a court convicted someone for merely possessing an object that could potentially be altered and converted into a silencer—where the object did, actually, function as something else.

In Speed's case, the District Court applied a near-strict-liability standard for possession of objects that the government claimed were silencers. Such a low

---

[5] For example, in *United States v. Syverson*, 90 F.3d 227, 232 (7th Cir. 1996), the ATF conceded that even a mere empty cylinder attached to the end of a gun barrel reduced noise in a slight amount. It could be used to reduce the report of a pistol from 151 decibels to 144.5.

standard of scienter and *mens rea* for possession crimes has been previously rejected by most courts, including the Supreme Court, in such cases as *Staples v. United States*, 511 U.S. 600 (1994), *Ruan v. United States*, 142 S.Ct. 2370 (2022), and *Liparota v. United States*, 471 U.S. 419 (1985).

### A.    The evidence was insufficient for conviction

This case involves three solvent trap containers designed and marketed for gun owners to clean their guns by capturing draining solvents from empty gun barrels. Speed's solvent filter traps were not silencers in the form possessed by Speed—according to any established test. The evidence presented by the Government at trial indicated only that the devices *could* be converted into silencers with sufficient milling, fabrication, disassembly, and reassembly. JA 1094-1095.

Speed's case—involving devices which functioned as solvent traps but needed disassembly, removal of parts, actual drilling, milling, and reassembly using tools not possessed by Speed—presents an extension of "silencer law" that has never been previously considered. In fact, all case law with any analysis to speak of stands for the proposition that Speed's three solvent traps *were not silencers under the law*. JA 0681.

### B.    The District Court's false construction of a "Mistake of Law"

Throughout weeks of 2021, the FBI planted an undercover FBI agent ("Al") in Speed's midst, seeking to develop evidence to criminally prosecute Speed.[6] The undercover agent repeatedly initiated conversations (which were secretly recorded) about silencers. But Speed's candid remarks about the purpose of his solvent traps were anything but incriminating. The most the secret recordings showed was that Speed speculated that, in a hypothetical event such as civil war, "the idea" of such things as solvent traps is that they might be converted (though perhaps not by Speed but by someone else)[7] into silencers. JA 1232.

Even worse, from a prosecutor's standpoint, were Speed's secretly captured assessments about the need to submit proper government forms if someone intended to convert the solvent traps into silencers: "once you drill a hole in the end without filling out the Form 1 [required to register silencers], you're a felon." JA 0133. The secret recordings also caught Speed admitting he, himself, didn't even know where to get a drill press to perform such modifications, but would need to "find" someone with a drill press if he ever intended to do so. *Id.*

---

[6] It appears that Speed came under the Government's radar after Speed's participation in the events of January 6, 2021 at the nation's Capitol. Speed has been separately prosecuted (and now convicted), for entering the U.S. Capitol and obstructing proceedings (currently on appeal separately in the D.C. Circuit).

[7] Speed's secretly recorded speculation about converting solvent traps to silencers were worded in the objective sense ("you") rather than in any subjective sense.

Speed's assessment was almost certainly true as a matter of fact and law at the time Speed made his remarks (except Speed's own case now stands for an opposite proposition of law.)

**C.    The District Court improperly construed Speed's statement of knowledge and intent about his solvent traps to be a forbidden "mistake of law" defense**

For obvious reasons, prosecutors fought fiercely to keep Speed's remarks about the need to "fill out Form 1" from the jury. The Government filed a number of motions *in limine* arguing that such evidence constituted an improper "mistake of law" defense—and that, even if Speed's remarks were probative regarding Speed's knowledge and intent, the remarks would be misleading and unfairly prejudicial to the Government. JA 0262. The District Court wholly embraced the prosecution's arguments and made them its own.

**D.    Possession of an unregistered silencer under the National Firearms Act is a specific-intent crime; and a mistake of law defense is generally permitted for such crimes**

Generally, the Government's burden of proof regarding *mens rea* increases with the severity of the penalties for crime and the complexity of a regulatory scheme. *Staples*, 511 U.S. at 601. The NFA is a set of statutes and definitions extending through at least two titles of the U.S. Code, involving the administration of taxes and registration records. The Act's definition of "firearm silencer" criminalizes unregistered possession of "any combination of parts, designed or

redesigned, and *intended* for use in assembling or fabricating a firearm silencer." 18 USC § 921(a)(25) (emphasis added). This is plainly a specific-intent crime, where a mistake of law is a defense.

But even if Speed's statements were a "mistake of law," Speed's statements were highly relevant to show his understanding that the solvent traps were not "silencers"—and that Speed had no intent (outside utter hypothetical speculation about an unspecified, hypothetical future) to use them as silencers. These statements constituted Speed's most candid, secretly-captured proof of innocent scienter. And the District Court's exclusion of Speed's proof of innocence was in error.

### E.    Improper jury instructions watered down the requirements for conviction

Applying the District Court's construction that Speed's knowledge of requirements for registering firearms was an improper "mistake of law" defense, the Court issued jury instructions which improperly directed jurors to ignore Speed's state of mind and focus instead on the physical traits of Speed's three devices. JA 0526-0528. And then the Court compounded its error by repeatedly emphasizing that the devices need not be operable for conviction. JA 0526.

In essence, the judge and the prosecutors worked together to draft a *new statute*: one that would allow up to ten years in prison for possessing items which functioned as other things (e.g., solvent traps) but which *could*—with enough

modification—be made into silencers, even where a possessor had no intent (outside perhaps hypothetical conjecture) to use the items as silencers.

The Court's instructions and preclusions of Speed's defenses violated well-worn principles regarding *mens rea* laid out in such cases as *Staples*, 511 U.S. 600, *Ruan*, 142 S. Ct. 2370, *Liparota*, 471 U.S. 419 and *Crooker*, 608 F.3d 94.

> **F.** **The District Court wrongly applied Rule 403 balancing to preclude Speed's relevant, probative statements, thus depriving Speed of his primary defense**

As justification for depriving Speed of his right to show evidence of his innocence to the jury, the Court cited Federal Rule of Evidence 403, which allows a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of…unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

But constitutional due process, basic rules of fairness, and the Federal Rules of Evidence themselves favor admission of any evidence tending to prove or disprove a fact in issue; balancing under Rule 403 should always be struck in favor of admission. *See J. Weinstein & M. Berger, Weinstein's Evidence* at 403-47 (1986).

> **G.** **The Statute(s) are void for vagueness as applied to Speed's case**

Fundamental principles of due process require that where reasonable minds can disagree over the construction of a criminal law, or where a reasonable person cannot determine whether his conduct may or may not fall within the protections of the law, such a law is void for vagueness. Reasonable minds can certainly disagree over whether the NFA's silencer provisions apply to Speed's non-silencing solvent traps. Thus, Speed's convictions must be vacated on void-for-vagueness grounds.

### H. Even if Speed possessed actual, true silencers, such possession is protected under the Second Amendment

Finally, the Supreme Court's recent ruling in *Bruen*, 142 S. Ct. 2111 requires that Speed's convictions be overturned on Second Amendment grounds. The Second Amendment right to keep and bear arms protects individuals' possession of firearms, defensive arms, and arms accessories, including silencers. *Id*.

## IV. ARGUMENT

### A. The District Court erred in classifying evidence that Speed believed his devices did not qualify as silencers needing registration as a "Mistake of Law"

Standard of Review: "[W]e review the district court's factual findings for clear error and its legal conclusions de novo." *United States v. Bolander*, 772 F.3d 199, 206 (4th Cir. 2013).

A mistake of law ("I didn't know what I did was illegal") is substantially different from Speed's defense ("possession of a silencer is a felony, but the devices I possess *are not* silencers and someone would need to fill out government paperwork if they ever wanted to convert the devices into silencers").[8]

In this case, the definition of a firearm silencer (at least in two of three definitional prongs) makes Speed's offense a *specific-intent* crime, where mistake-of-law defenses are allowed. *See United States v. Kenyon*, 481 F.3d 1054 (8th Cir. 2007); *United States v. Hayden,* 64 F.3d 126 (3rd Cir. 1995) (finding that a defendant must act with knowledge he is violating the law, and excluding evidence of defendant's low I.Q. and unawareness was reversible error); *United States v. Curran,* 20 F.3d 560 (3rd Cir. 1994) (holding that a jury should have been instructed that the defendant must have known of the campaign treasurers' reporting obligations, that he attempted to frustrate those obligations, and that he knew his conduct was unlawful); *United States v. Grigsby,* 111 F.3d 806 (11th Cir. 1997) (the African Elephant Conservation Act, 16 U.S.C. §4223(l), makes it a crime to knowingly violate the provisions of the act; even though there is no "willful" element of the act, the government must prove that the defendant knew the provisions of the law and knowingly violating the law); *United States v. Rhone,*

---

[8] Speed's precise words, recorded by the undercover agent, were: "once you drill a hole in the end without filling out the Form 1 [required to register silencers], you're a felon").

864 F.2d 832 (D.C. Cir. 1989) (reversed where trial judge informed jury that defendant's ignorance of the law was no excuse; jury could have thought the government didn't need to prove intent to defraud the government when the defendant attempted to get unemployment benefits while working full time).

In *Liparota*, 471 U.S. at 422, for example, the Supreme Court reversed a conviction for improper possession of food stamps, where a district court had improperly rejected a petitioner's proposed specific-intent instruction. The rejected instruction would have instructed the jury that the Government must prove that "the defendant knowingly did an act which the law forbids, purposely intending to violate the law." *Id*. The district court in *Liparota* had wrongly concluding that "[t]his is not a specific intent crime" but rather a "knowledge case." *Id*.

Whether Speed's devices fit the definition of "any combination of parts, designed or redesigned, and *intended* for use in assembling or fabricating a firearm silencer" plainly invokes the totality of awareness of the possessor. 18 U.S.C. § 921(a)(25) (emphasis added). And because almost any inanimate object could be transformed into a "silencer" with enough modification, Speed was entitled to present a defense involving the totality of his awareness. *Cf, Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 25, 30 (D.C. Cir. 2014) (stating in response to ATF's claim that a device was a silencer because it had three out of eight physical characteristics consistent with those on silencers: "A mouse is not an 'elephant'

solely because it has three characteristics that are common to known elephants: a tail, gray skin, and four legs").

### i.   The *Crooker* decision

The case of *United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010)—ironically one of the cases the Government relied on for its "Silencer-Need-Not-Be-Operable" jury instruction—actually supports Speed's defense. The device in *Crooker*, a "cylinder made of black metal with a hole running through it, threading that allowed attachment to the muzzle of the airgun and baffles inside," was plainly designed for use as a legal *air gun* silencer. *Id*. at 95. But, just as in Speed's case, the Government argued that the device *could* be made into a firearm silencer. Just as in Speed's case, an ATF expert who tested the device needed to install an "adapter" to the barrel of an ordinary gun to connect the two implements. *Id*. at 96.

The First Circuit honed in on precisely the set of problems existing in both *Crooker*'s and Speed's case. "[P]roblems arise in two different dimensions: [the device's] capability for use as a silencer and, separately, the defendant's knowledge, purpose or both with respect to the device." *Id.* at 97.

> We conclude, however, that the statute by its terms requires something more than a potential for adaptation and knowledge of it. The statute does not refer either to capability or adaptation; it speaks of a device "for" silencing or muffling. The ordinary connotation of the word is one of purpose. *See* The Random House Dictionary of the English Language 747 (2d ed. unabr.1987) (providing a first definition of "for" as "with the object or purpose of). The government does not argue that the evidence proved that either Crooker or the

maker of the airgun silencer intended that it be used to silence a firearm, but rather that "for" does not entail purpose but only knowledge of capability. *Id.*

### ii. *Crooker*'s conclusion that different levels of *mens rea* apply to each prong of § 921(A)(25)'s definition

Section 921(A)(24)'s "silencer" definition offers three possible paths for conviction; and the *Crooker* Court found each path required a slightly different level of *mens rea* for conviction. The first prong, "any device for silencing, muffling, or diminishing the report of a portable firearm," is suggestive of mere knowledge that a device has all the features of a fully functioning silencer. *Crooker*, 608 F.3d at 96–97. But the second and third prong plainly invoke levels of specific intent. "Still, it is as easy (perhaps easier) to view all three tests as gradations of purpose made more rigorous as the statute extends from a self-sufficient device to a collection of parts to a single part." *Id.*, 608 F.3d at 97.

Thus, a mere "knowledge" requirement was not applicable to the "parts" prong because the definition "could also extend to a soda bottle or even a potato." *Id.* "The peculiar problem of silencers is that many objects, including relatively innocent ones, have some capacity to muffle the sound of a shot." *Id*.

### iii. *Staples* does not support the District Court's evidentiary rulings but actually supports Speed's defense

In Speed's pretrial proceedings, the Government and Court repeatedly claimed they were following *Staples*, 511 U.S. 600 in their imposition of

instructions which prevented Speed from alerting the jury to Speed's exculpatory remarks and conduct. The District Court largely interpreted *Staples* to allow conviction under § 5861 upon a virtual strict liability level of awareness; ironically the very standard that *Staples* had overturned and rejected. *Id*.

At least with regard to procedural travel, Speed's case is a cookie cutter copy of *Staples*. Speed's case involves some of the same jury instruction errors, and the same evidentiary errors *as were invalidated* in *Staples*. In *Staples*, the petitioner was indicted for unlawful possession of an unregistered machinegun in violation of § 5861(d) (the same law Speed is now convicted of violating).

> At trial, [ATF] agents testified that when [Staples'] AR-15 was tested, it fired more than one shot with a single pull of the trigger. . . . Petitioner testified that the rifle had never fired automatically when it was in his possession. He insisted that the AR-15 had operated only semiautomatically. . . According to petitioner, his alleged ignorance of any automatic firing capability should have shielded him from criminal liability for his failure to register the weapon. He requested the District Court to instruct the jury that, to establish a violation of § 5861(d), the Government must prove beyond a reasonable doubt that the defendant "knew that the gun would fire fully automatically."
> The District Court rejected [Staples'] proposed instruction and instead charged the jury as follows:
> "The Government need not prove the defendant knows he's dealing with a weapon possessing every last characteristic which subjects it to the regulation. It would be enough to prove he knows that he is dealing with a dangerous device of a type as would alert one to the likelihood of regulation."

*Staples*, 511 U.S at 603-604.

Similarly, Speed had requested a jury instruction that informed the jury that conviction required proof that Speed knew his items qualified as legal silencers. But just as in *Staples*, the trial court gave only a "knowingly" instruction, combined with other instructions which emphasized a near-strict-liability level of scienter. JA 0342-0343.

There is another significant distinction between *Staples* and Speed's case. The firearm in *Staples* was an operating *machinegun*; while Speed's three metal container devices could not have functioned as silencers without several alterations, requiring tools not in Speed's possession.[9]

By contrast, Speed's three devices showed no alterations, and were in their original packaging, plainly marked "particulate trap." JA 0108. And there was no evidence that Speed had been anything but forthright, explicit, and transparent to

---

[9] And the machinegun in *Staples did show alterations* indicating Staples had in fact caused the AR-15 to function as an M-16:
Many M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon. No doubt to inhibit such conversions, the AR-15 is manufactured with a metal stop on its receiver that will prevent an M-16 selector switch, if installed, from rotating to the fully automatic position. The metal stop on petitioner's [Staples'] rifle, however, *had been filed away, and the rifle had been assembled with an M-16 selector switch and several other M-16 internal parts, including a hammer, disconnector, and trigger*. Suspecting that the AR-15 had been modified to be capable of fully automatic fire, BATF agents seized the weapon. *Staples*, 511 U.S at 603 (emphasis added).

everyone[10]—including even the undercover FBI agent seeking to draw incriminating statements from Speed.

The government's arguments in Speed were identical to what the *Staples* Court imagined as the most horrific possibility: a construction that anyone merely possessing an AR-15 could be convicted under § 5861 if—unbeknownst to them—their AR-15 could fire automatically rather than semi-automatically:

> The Government does not dispute the contention that virtually any semiautomatic weapon may be converted, either by internal modification or, in some cases, simply by wear and tear, into a machinegun within the meaning of the Act. Such a gun may give no externally visible indication that it is fully automatic. But in the Government's view, any person who has purchased what he believes to be a semiautomatic rifle or handgun, or who simply has inherited a gun from a relative and left it untouched in an attic or basement, can be subject to imprisonment, despite absolute ignorance of the gun's firing capabilities, if the gun turns out to be an automatic.
> *Staples*, 511 U.S. at 599 (citations omitted).

The Supreme Court plainly rejected the government's contention that because "virtually any semiautomatic weapon" *could* be converted—with enough drilling, fabrication, milling, or additional accessories—into a machinegun—an unwitting possessor of "virtually any semiautomatic weapon" could be subjected to

---

[10]In addition to the solvent traps, Speed owned several properly registered silencers among his firearm collection. This fact shows Speed's disposition regarding compliance with gun regulations. Speed was familiar with federal National Firearm Act application paperwork.

years in federal prison despite having an innocent state of mind. JA 0345. Yet here, in Speed's case, we have entered that very nightmare.

Importantly, the machinegun definition at issue in *Staples* does not contain the specific-intent language present in the silencer definition.

> Nor is the difference in language difficult to explain: something is or is not an automatic weapon, but the range of physical objects that can muffle a firearm is so large and of so many alternative uses that **some filtering restriction is needed to prevent overbreadth and possibly vagueness.**

*Crooker*, 608 F.3d at 97 (emphasis added).

Just as in the *Crooker* case, Speed's devices can only be considered (if anything) to be 'combinations of parts,' requiring actual *proof of Speed's intent* to combine the parts into a silencer. *Cf, United States v. Webb*, 975 F.Supp. 1280 (D. Kan. 1997) (involving homemade silencers constructed of toilet paper tubes and stuffing from stuffed animals. In the wake of *Staples* (decided after Webb's trial and conviction), the district court vacated Webb's convictions pursuant to a § 2255 motion due to strict-liability-type jury instructions of the same type rejected in *Staples* (but given in Speed's trial)).

### iv. The District Court wrongly applied Rule 403 balancing to preclude Speed's relevant, probative statements which pertained to Speed's primary defense

Rule 403 provides that the trial judge "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the

following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. The Federal Rules of Evidence favor admission of any evidence tending to prove or disprove a fact in issue. *United States v. Finestone*, 816 F.2d 583, 585 (11th Cir. 1987). The "balance [under Rule 403] should be struck in favor of admission." *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir.1980) (citation omitted); *accord* King, 713 F.2d at 631; *United States v. Moore*, 732 F.2d 983, 988-89 (D.C. Cir. 1984). Appellate courts "must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir.1983) (quoting *United States v. Brady*, 595 F.2d 359, 361 (6th Cir.), cert. denied, 444 U.S. 862, 100 (1979)).

The District Court's discretion to exclude evidence under Rule 403 is limited. Evidence may be excluded only when "its probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403. As we have cautioned, "Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir.) (citing *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983), *cert. denied*, 466 U.S. 942 (1984)).

The probative value of the recordings of Speed's prior statement[11] showing Speed's future intent[12] to never convert his HIT solvent traps into silencers until he first filed the proper NFA paperwork, cannot be overstated. JA 0294. This was Speed's primary defense. And by precluding this vital exculpatory evidence, the District Court deprived Speed of his right to present a defense and a fair trial.

Even if Speed's "subjective understanding about the operability of the device" was somehow an improper "mistake of law defense," the evidence was also the best and most relevant evidence of Speed's knowledge of the characteristics of the devices, and Speed's primary defense that he did not intend to possess unregistered silencers. JA 0296.

### v. The excluded statements concealed from the jury the fact that Speed had no intent to make modifications to the solvent trap devices (unless Speed first submitted proper paperwork)

Threats to do something conditioned on something else happening are not true threats. *See Watts v. United States*, 394 U.S. 705, 706 (1969) (invalidating conviction for threatening the president where the speaker said "I am not going [to Vietnam]. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." during a 1966 political debate); *see also Holloway AKA Ali v. United*

---

[11] Rule 801 defines prior consistent statements as nonhearsay if they are offered to rebut a charge of recent fabrication or improper influence or motive.
[12] Statements of future intent or then-existing state of mind are not hearsay. See FRE 803(3).

*States*, 526 U.S. 1, 9 (1999) (recognizing that "specific intent" to commit a wrongful act may be conditional and thus negated).

At the very least, evidence that intent is conditional is probative evidence that must be considered by a factfinder. *Nobles v. Commonwealth*, 238 S.E.2d 808, 810 (1977) (explaining that a conditional threat—that the defendant would kill the victim if she moved—was probative evidence regarding whether there was intent to kill).

**B.      The jury instructions misstated the law by overemphasizing the physical features of devices rather than Speed's intent, while stressing that the physical feature requirements were very relaxed**

Standard of Review: "We 'review[] jury instructions in their entirety and as part of the whole trial . . . [to] determine . . . whether the [district] court adequately instructed the jury on the elements of the offense and the accused's defenses." *United States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995). Both the decision whether to give a jury instruction and the content of that instruction are reviewed for an abuse of discretion. *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009).

**i.      The District Court's jury instructions emphasized both that jurors should focus on the design features of Speed's devices but that the devices needn't be operable for conviction**

Under this test, *the device does not need to be operable* to substitute a silencer as long as the purpose of the device is to silence, muffle, or diminish the report of a portable firearm. *In determining whether the*

> *purpose of a device is to silence, muffle, or diminish the report of a portable firearm, you should focus on the objective design features of the device.* . . The government is not required to prove that the defendant knew that his acts or omissions were unlawful or that the defendant had knowledge of the statute at issue or its specific prohibitions.
> JA 1126. (Jury instructions by Judge Nachmanoff (emphasis added)).

Judge Nachmanoff's instructions stressed that having an innocent state of mind was no defense:

> Motive is not an element of the offense with which the defendant is charged. . . proof of good motive alone does not establish that the defendant is not guilty.
> JA 0528.

A trial judge can commit error by overemphasizing in a way that directs a jury to look at one thing and not another. See *Caldwell v. Mississippi*, 472 U.S. 320 (1985) (recognizing that jury instructions which minimize a jury's sense of responsibility for a death sentence implicitly urge jurors to recommend the death penalty).

The District Court's overemphasis on the physical features of Speed's devices—while simultaneously deemphasizing the requirement of the Government to prove criminal intent on Speed's part—violated the foremost rule of adversarial justice. "[O]ur adversary system presupposes," wrote Justice Potter Stewart, that "accurate and just results are most likely to be obtained through the equal contest of opposed interests." *Lassiter v. Dep't of Soc. Srvcs.*, 452 U.S. 18, 28 (1981). And

combined with the Court's repeated emphasis that a "silencer" need not be

operational in order for its possessor to be convicted, these jury instructions sealed

Speed's convictions.

### ii.     The District Court's "Silencer-Need-Not-Be-Operable" instruction was not an accurate statement of the law, especially as applied to Speed's devices, which required actual modifications to convert to silencers

Not only did the "Silencer-Need-Not-Be-Operable" instruction place undue

emphasis on a notion that functionality wasn't necessary for the jury to convict

Speed, the instruction was not even an accurate statement of the law. JA 0311. The

"combination of parts" part of § 921(a)(25) emphasizes a defendant's intent, rather

than features of a device.[13]

---

[13] As support for Instruction No. 36 (the "Silencer-Need-Not-Be-Operable" instruction), the Government cited three cases. None of the cases support the language of the instruction. The first case cited is an unpublished case, *United States v. Coffell*, 720 F. App'x 521, 528 (11th Cir. 2017) which involved a defendant who possessed an actual, working, silencer which lacked serial numbers. Coffell did "not dispute, and the evidence shows, that the silencer he possessed is a "firearm" as defined in § 5845(a), in that it was tested and found to reduce the sound of a firearm. . ." Nothing in the *Coffell* case remotely resembles the issues present in Speed's case.
The second case, *Crooker, is discussed elsewhere* and supports Speed; not the prosecution regarding this issue.
The third case, *United States v. Carter*, 465 F.3d 658, 667 (6th Cir. 2006) (per curiam), held that "possessing the frame or receiver of a machine gun and parts designed and intended for use in converting a weapon into a machine gun" satisfies the definition of machine gun for purposes of indicting an individual under § 5861(d) (As already discussed, the machinegun definition does not contain the specific-intent component that the "combination of parts" segment of the silencer definition contains).

## C.    The Evidence was insufficient for conviction

Standard of Review: "The verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support the findings of guilt." *United States v. Corso*, 439 F.2d 956, 957 (4th Cir. 1971); *United States v. Sherman*, 421 F.2d 198, 199 (4th Cir. 1970).

Even in a light most favorable to the verdict, the Government failed to show evidence sufficient to convict Speed of possession of unregistered silencers under 26 U.S.C. § 5861 as defined at 18 U.S.C. § 921. Specifically, there was no evidence—none—of any non-conjectural criminal intent by Speed to ever convert his lawfully, commercially purchased solvent traps into silencers. There was no evidence that Speed ever planned to do anything other than speculate about modifying his solvent trap purchases into silencers.

### i.    Speed's devices were not silencers, under any test

Section 921(A)(25) provides three possible definitional prongs for a firearm silencer: (1) "any device for silencing, muffling, or diminishing the report of a portable firearm;" (2) "including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler;" and (3) "any part intended only for use in such assembly or fabrication." JA 0311. Speed's devices fell into none of the three categories.

Because Speed's three HIT particulate traps were functional *as* solvent traps, and *not* as silencers, the analysis could stop here. Speed did not even have the tools and equipment that were required to disassemble, drill and reassemble the items to convert them to silencers.

### ii. Speed's devices could not be "assembled" into a silencer without modification or fabrication

Although the statute permits conviction for possessing "a combination of parts," the statute does not say conviction can be predicated on a combination of parts that *need altering*. And no carefully analyzed published case has ever construed the silencer definition to apply in such a way. Moreover, ancient principles of lenity with regard to criminal laws make the statute void for vagueness if such concepts can be read into the statute. *United States v. Davis*, 139 S. Ct. 2319, 2332-33 (2019); *Staples*, 511 U.S. at 617–18.

The plain text of § 921(a)(25), and all known case law criminalize only possession of parts that could be "assembled" into a prohibited device. 18 USC § 921(a)(25). The definition does not support any prohibition of possessing mere raw materials or components of another functioning product when drilling, tapping, reworking or modification are required to convert said items into a prohibited device. *See United States v. Morningstar*, 456 F.2d 278, 281 (4th Cir.), *cert. denied*, 409 U.S. 896 (1972) (*citing United States v. Harriss*, 347 U.S. 612, 617 (1954) ("On its face, the definition of a destructive device gives fair notice to a

person of ordinary intelligence that it includes any combination of parts intended to be used as a bomb or weapon and from which a bomb or weapon can be readily assembled").

### iii.   The statutory definition of a "silencer" excludes multifunctional items

The Supreme Court has held that the conflicting parts and subsections of the NFA must be resolved with the rule of lenity. *United States v. Thompson Center Arms Company*, 504 U.S. 505 (1992). Devices which are functional as things other than silencers, or which would require a user to make them into "silencers" cannot be regulated *as* silencers. JA 0668. "Accordingly," wrote the Court, "we conclude that the Contender pistol and carbine kit when packaged together by Thompson/Center have not been "made" into a short-barreled rifle for purposes of the NFA." *Id*. at 518; *see also United States v. Thompson*, 82 F.3d 849, 854 (9th Cir. 1996) (reversing conviction for possessing an unregistered silencer where the silencer had originally been manufactured as a fake suppressor or dummy silencer.); *United States v. Alexander*, 480 F. Supp. 3d 988, 398 (N.D. Cal. 2020) (denying motion to dismiss because "Defendant, a gun enthusiast, had fair notice that he possessed an object whose only purpose was to silence").

By the same logic applied in *Thompson*, Speed's particulate traps simply are not silencers as a matter of law. Speed's devices functioned as gun cleaning

containers but could *not* be assembled or completed into a working silencer, without milling or modification.

Moreover, entirely inert materials cannot be a "combination of parts"[14] requiring NFA registration. *United States v. Malone*, 546 F.2d 1182 (5th Cir. 1977) (despite possessing materials that could be assembled into a destructive device, Malone did not have any explosive material necessary to complete such a device. Thus, although the device had no legitimate social use, the defendant could not be found guilty).

At least three Circuits, including this Circuit, have held that a defendant must possess all of the necessary components in order to be convicted of possessing a "combination of parts" as a destructive device. *See United States v. Blackburn*, 940 F.2d 107, 110 (4th Cir. 1991); *United States v. Posnjak*, 457 F.2d 1110, 1116 (2d Cir. 1972); *United States v. Malone*, 546 F.2d 1182, 1184 (5th Cir. 1977). In Speed's case, the devices not only lacked a hole through the bottom, but also lacked a drill, a hardened drill bit capable of drilling through titanium steel, an Allen wrench, and a vice. Cf, *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 25, 30 (D.C. Cir. 2014) (stating in response to ATF's claim that a device was a silencer because it had three out of eight physical characteristics consistent with

---

[14] Note that the word "combination" stems from the word "combine," which means parts that can be joined together to form a working whole. This does not include parts that need changing.

those on silencers: "A mouse is not an 'elephant' solely because it has three characteristics that are common to known elephants: a tail, gray skin, and four legs").

This Court's opinion in *United States v. Morningstar*, 456 F.2d 278 (4th Cir. 1972) also construed certain of these provisions to support a subjective intent inquiry. This Court of Appeals held that the defendant's specific intent was critical in answering the question of whether commercial explosives are destructive devices covered by the Act. *Id*. at 280 (stating that this issue "must be determined" by the defendant's *intentions*). The court analyzed the third subsection of § 5845(f), first mentioning the statute's design provision and noting that it serves to proscribe items such as "unassembled parts of a military fragmentation or incendiary bomb," regardless of their intended use. *Id*. The court noted that, had Congress wished to completely exclude commercial explosives from the Act's reach, it could have stopped at this point. *Id.* at 281.

Yet Congress went on to include combinations of parts "*intended* for use in converting any device into a destructive device." *Id*. at 280 (emphasis added). According to *Morningstar*, the statute dictates that for items falling under the intent provision, as opposed to those proscribed under the design provision, "the use for which these materials are intended determines whether they fall within the Act." *Id*. at 280.

As in *Morningstar*, Speed's specific intent for which his devices were used is determinative of whether they are covered by the NFA. *See Morningstar*, 456 F.2d at 280–81. And Speed plainly expressed his innocent purpose in the excluded conversations with undercover FBI agent "Al."

**D.    The statute is unconstitutionally void for vagueness as applied**

**i.    Almost any household container could be a "silencer" under the District Court's rulings**

Moreover, if the law can be applied as it was in Speed's case, the statute is void for vagueness. The meaning of the term "silencer" as set forth in 18 U.S.C. § 921(25), as employed via 26 U.S.C. § 5861(d), and as applied against Speed is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. Under the definition applied in Speed's case, a possession of almost any household or automotive container with filter capabilities could be a "silencer," because it might be capable—with sufficient modification—of being transformed into a functioning firearm silencer.

Ingrained in the concept of due process is the underlying principle of notice — that an individual should not "be held criminally responsible for conduct which [they] could not reasonably understand to be proscribed." *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)); *see also United States v. Hoechst Celanese Corp.*, 128 F.3d 216, 224 (4th Cir. 1997) ("[I]t is well established in criminal law that no punishment

can be imposed without notice"); *Rabe v. Washington*, 405 U.S. 313 (1972) (reversing conviction that relied on an unforeseeable construction of a statute because the defendant was "not given fair notice" of the additional "vital element of the offense"). Notice is required, for example, "before property interests are disturbed, before assessments are made, before penalties are assessed." *Lambert v. California*, 355 U.S. 225, 229 (1958) (reversing conviction where defendant was "given no opportunity to comply with the law and avoid its penalty, even though her default was entirely innocent").

The Government claims that the solvent traps Speed possessed are firearm silencers as defined by 18 U.S.C. § 921(25) and therefore must be registered pursuant to 26 U.S.C. §§ 5841 and 5861(d). But neither the definitional statute nor the statute criminalizing unregistered possession, § 5861(d), lists any essential or easily identifiable design, physical feature, or characteristic that a device must have to make it subject to registration requirements as a silencer. JA 0114.

Rather, the definition states broadly that any device for silencing, muffling, or diminishing the report of a portable firearm qualifies as a "silencer." 18 U.S.C. § 921(25). Such devices could include, for example, plastic bottles, potatoes, pillows, books, banners, flags, clothing, tools, electronic equipment, etc. — so long as the object is "for" silencing, muffling, or diminishing a firearm's report. *Id*. The Supreme Court declines to accept "boundless reading[s]" of statutory terms where

such reading would lead to "deeply serious consequences." *Bond v. United States*, 572 U.S. 844, 860 (2014); *see also United States v. Schrum*, 346 F. Supp. 537-38 (E.D. Va. 1972) (cautioning against an overly broad approach to analyzing whether a device was intended "for" reducing noise level").

The broad, vague language in the statute permitted the ATF to determine for itself what it actually considered a "silencer" and left Speed in the dark as to whether the devices he bought had to be registered — even as he sought to comply with law as he understood it. In *City of Chicago v. Morales*, 527 U.S. 41 (1991), the Supreme Court reviewed a city ordinance that prohibited gang members from loitering in public places. The Court found that although the term "loitering" was defined in the statute ("to remain in place with no apparent purpose"), the definition was unconstitutionally vague because it did not adequately apprise people how to comply. *Id*. at 56-59 ("It is difficult to imagine how any citizen of the city of Chicago standing in a public place with a group of people would know if he or she had an 'apparent purpose'"). Here, similarly, § 921(25)'s definition of "silencer" — which, again, informs 26 U.S.C. § 5845(a)'s definition of "firearm," which then informs § 5861's prohibitions — provides no clarity as to which devices the ATF will opt to classify as "silencers" or as to how to understand whether such a device is "intended for use in assembling or

fabricating a firearm silencer or firearm muffler." *Cf, United States v. Apel*,

134 S. Ct. 1144, 1151 (2014) ("[W]e have never held that the Government's

reading of a criminal statute is entitled to any deference").

### i.    ATF Regulations did not give Speed fair notice.

The ATF's regulations and other public guidance issued to interpret and

enforce the Gun Control Act and this provision in particular also fail to clarify the

scope of the criminal offense such that an "ordinary [person] can understand what

conduct is prohibited." *Beckles*, 580 U.S. at 626. Instead, the ATF appears to have

drastically expanded its interpretation of the definition of "silencer" for purposes of

enforcement by characterizing solvent traps as silencers — without issuing public

guidance to provide fair notice to individuals who may inadvertently possess the

previously legal solvent traps.

### E.    Alternatively, even if Speed's devices were silencers, the Second Amendment protects such possession

The Second Amendment provides: "A well regulated Militia, being

necessary to the security of a free State, the right of the people to keep and bear

Arms, shall not be infringed." U.S. CONST. amend. II. This right, as confirmed in

*District of Columbia v. Heller*, covers not only the possession of firearms but also

the use of items that enhance their utility, including accessories like silencers,

which are in common use for lawful purposes. 554 U.S. 570, 628 (2008). Like a

bipod, scope, or magazine, noise suppressors enhance the utility of an "arm." 18

U.S.C. § 921. According to the Gun Control Act, codified at 18 U.S.C. § 921 (a)(3), noise suppressors are classified as "firearms."

The historical analysis in *Heller*, suggests that the Second Amendment should be read to provide some protection for noise suppressors. The Court interpreted the term "arms" to mean the same now as in 18th-century dictionaries, to include "weapons of offence, or armour of defence"—specifically mentioning "bows and arrows," the quintessential quiet weapon of the day. *Id.* at 581. Because of their capacity for stealthy operation, bows and arrows held a distinct advantage over firearms as hunting tools. The Court in *Heller* acknowledged that hunting was "undoubtedly" one of the "reason[s] Americans valued the ancient right," also listed militia and self-defense as other motivations behind the adoption of the Second Amendment. *Id.* Noise suppressors also have clear public health benefits and are protected under the Second Amendment.

In *Bruen*, the Court corrected decades of erroneous case law which had given undue deference to government gun control regulations in the face of the Second Amendment. *See Bruen*, 142 S. Ct. at 2111. Indeed, in *Bruen,* the Court stated that "the constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2111, citing *United States v. Harriss*, 347 U.S. 612 (1954).

Under the historically based test articulated in *Bruen*, a court must first determine whether "the Second Amendment's plain text covers" the "proposed course of conduct." *Bruen*, 142 S. Ct at 2129-30. If a court determines that the Second Amendment covers the conduct in question, the Government "must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2130. Second Amendment scholar Stephen P. Halbrook, in an article entitled "Firearm Sound Moderators: Issues of Criminalization and the Second Amendment," concluded that firearm silencers fall squarely under the Second Amendment's protections. 46 CUMBERLAND L. REV. (2016). Silencers serve a variety of lawful purposes and impart significant advantages to lawful firearms users, such as protecting one's hearing and improving accuracy by eliminating the auditory distraction caused by a loud report, as well as diffusing the force exerted by the firing of a weapon and allowing the user to maintain more accurate aim on their intended target. Such advantages find utility in a variety of lawful firearm use contexts, including hunting, sport-shooting, or self- or home-defense. *See* A.J. Peterman, "*Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense*," 97 MARQ. L. REV. 853, 892 n.221 (2014); Halbrook, 46 CUMB. L. REV. at 69 ("Legitimate advantages could also be listed for a

suppressor, whether used for sporting purposes or for self-defense—reduction of noise, recoil, and muzzle rise immediately come to mind").

Additionally, the fact that firearm silencers are in common use throughout the United States supports a finding that suppressors should be considered to fall within the scope of arms protected by the Second Amendment. According to historian Oliver Krawczyk in his article titled "Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise," there are now some 2,664,774 silencers in circulation. 127 DICK. L. REV. 273 (2022). Krawczyk continues to point out that "[w]ith millions of suppressors already registered and a vibrant, streamlined marketplace in existence, suppressors are becoming ubiquitous in modern firearm ownership." *Id.*

In short, suppressors are accessories which impart significant advantages to lawful firearms users across many categories of historically protected firearms use. A finding that noise reducing devices fall outside the scope of protection afforded by the Second Amendment would be inconsistent with the "nation's historical tradition of firearms regulation" and would contradict *Bruen.*

## CONCLUSION

For all the foregoing reasons, Appellant Hatchet M. Speed was wrongly convicted of possessing unregistered silencers in violation of the National Firearms

Act. Accordingly, Speed prays for reversal of his convictions, a new trial, and/or

any other remedy this Court of Appeals deems proper.

RESPECTFULLY SUBMITTED,

By: /s/ Edward Andrew Paltzik
Edward Andrew Paltzik, Esq.
Bochner PLLC
1040 Avenue of the Americas,
15th Floor
New York, New York 10018
(516) 526-0341
edward@bochner.law