IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————————

No. 23-4308

—————————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

HATCHET M. SPEED,

*Appellant*.

—————————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Alexandria
*The Honorable Michael S. Nachmanoff, District Judge*

—————————————

BRIEF OF THE UNITED STATES

—————————————

Jessica D. Aber
United States Attorney

Amanda St. Cyr
Assistant United States Attorney

Danya E. Atiyeh
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

*Attorneys for the United States of America*

# Table of Contents

**Page**

Table of Authorities ............................................................................ iv

Introduction ....................................................................................... 1

Issues Presented ................................................................................. 2

Statement of the Case ......................................................................... 2

     A.    Speed's Purchase of the Unregistered Silencers from Hawk
           Innovative Tech ........................................................................ 2

     B.    Speed's Meetings with the FBI Undercover Employee ....................... 4

     C.    Speed's Arrest .......................................................................... 5

     D.    Speed's Motion to Dismiss ......................................................... 5

     E.    December 2022 Pretrial Conference ............................................. 6

     F.    First Trial ................................................................................ 6

     G.    Retrial .................................................................................... 7

     H.    Motion for New Trial and Sentencing ......................................... 13

Summary of Argument ...................................................................... 14

Argument ........................................................................................ 16

I.    The Government Introduced Sufficient Evidence to Prove that Speed
    Knowingly Possessed an Unregistered Silencer. ................................. 16

     A.    The jury correctly found that the Hawk devices constituted
           silencers under 18 U.S.C. § 921(a)(25). ..................................... 18

i

1. Section 921 sets forth three separate tests for determining when a device, combination of parts, and single part qualify as a silencer. ...................................................................18

2. The first test focuses on the *purpose* of the device in determining whether it constitutes a silencer. ...............................18

3. The jury determined the purpose of the device by looking at its objective design features. ..........................................................19

4. Under the text of the statute, a device does not need to be operable to qualify as a silencer. ...................................................22

B. The government proved that Speed knew the Hawk devices had the characteristics of a silencer. ..........................................................24

II. The District Court Did Not Abuse Its Discretion in Excluding Evidence Concerning Speed's Mistaken Belief that a Device Had to Be Operable to Require Registration as a Silencer. ......................................26

A. The district court properly excluded the evidence as relevant only to an improper mistake-of-law defense. .......................................28

B. Even if the evidence had some probative value, the district court did not abuse its discretion in excluding the evidence under Rule 403. ...................................................................................31

C. Even if the district court erred in excluding the evidence, any error was harmless. ...............................................................................34

III. The District Court Properly Instructed the Jury on the Definition of a "Firearm Silencer" Under 18 U.S.C. § 921(a)(25). ........................................37

A. The district court's instructions were consistent with the plain meaning of the statutory text. ...............................................................38

B.  The district court's instructions were consistent with the purpose of the NFA. ............................................................39

IV.  The Definition of "Firearm Silencer" in 18 U.S.C. § 921(a)(25) Is Not Unconstitutionally Vague. ............................................................40

V.  The NFA's Prohibition on Possessing Unregistered Silencers Does Not Violate the Second Amendment. ............................................................46

A.  The Second Amendment does not protect Speed's conduct because silencers are not bearable "arms." ............................................47

B.  Even if considered "bearable arms," silencers are "dangerous and unusual weapons" that can be regulated consistent with the Second Amendment. ............................................................48

C.  The NFA's registration requirements do not "infringe" on the Second Amendment. ............................................................50

D.  The NFA's requirements are analogous to historical laws regulating firearms in commerce. ............................................................51

Conclusion ............................................................53

Statement Regarding Oral Argument ............................................................54

Certificate of Compliance ............................................................54

**Table of Authorities**

Page

**Cases**

*Bryan v. United States*, 524 U.S. 184 (1998) ................................................. 27, 29

*Cox v. United States*, 2023 WL 4203261 (D. Alaska June 27, 2023) ....................48

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ................................ 46, 47, 48

*Doe v. Cooper*, 842 F.3d 833 (4th Cir. 2016) ...........................................................41

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ..............................................................43

*Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307 (4th Cir. 2017)........................46

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) ...................................40

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010)..........................................42

*Lara-Aguilar v. Sessions*, 889 F.3d 134 (4th Cir. 2019).........................................40

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...............................................47

*McFadden v. United States*, 576 U.S. 186 (2015) ...................................................43

*New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111
    (2022).......................................................................................................... passim

*Staples v. United States*, 511 U.S. 600 (1994)....................................... 27, 29, 30, 43

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) .....................................19

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) ........................ 51, 52

*United States v. Al-Azhari*, 2020 WL 7334512 (M.D. Fla. Dec. 14,
    2020) ....................................................................................................................48

*United States v. Assorted Firearm Silencers, Assorted Firearm
    Silencer Parts & the Domain Name Hawkinnovativetech.com*,
    No. 3:21-cv-00213-TCB (N.D. Ga.) ....................................................................3

*United States v. Barringer*, 25 F.4th 239 (4th Cir. 2022)........................................16

*United States v. Barronette*, 46 F.4th 177 (4th Cir. 2022)......................... 40, 41, 42

*United States v. Beidler*, 110 F.3d 1064 (4th Cir. 1997) ........................................16

*United States v. Bennett*, 984 F.2d 597 (4th Cir. 1993)..........................................41

*United States v. Black*, 431 F.2d 524 (6th Cir. 1970)..............................................39

iv

*United States v. Bolander*, 772 F.3d 199 (4th Cir. 2013) ........................................46

*United States v. Burfoot*, 899 F.3d 326 (4th Cir. 2018)................................... 34, 35

*United States v. Caldwell*, 7 F.4th 191 (4th Cir. 2021) ...................................35

*United States v. Carter*, 465 F.3d 658 (6th Cir. 2006) ............................... 19, 23

*United States v. Claybrooks*, — F.4th —, 2024 WL 44928 (4th Cir. Jan. 4, 2024)............................................................................................ 44, 46

*United States v. Counce*, 445 F.3d 1016 (8th Cir. 2006)............................................32

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018).............................. 30, 47, 48

*United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010) ............................ 18, 19, 42

*United States v. Dennis*, 19 F.4th 656 (4th Cir. 2021)............................................16

*United States v. Fall*, 955 F.3d 363 (4th Cir. 2020) ...............................................16

*United States v. Goff*, 517 F. App'x 120 (4th Cir. 2013)............................................32

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013)............................................44

*United States v. Hardin*, 889 F.3d 945 (8th Cir. 2018) ..........................................31

*United States v. Hasson*, 2019 WL 4573424 (D. Md. Sept. 20, 2019)...................48

*United States v. Hasson*, 26 F.4th 610 (4th Cir. 2022) ..........................................45

*United States v. Hawkins*, 2022 WL 743571 (N.D. Ohio Mar. 11, 2022) ................................................................................................................23

*United States v. Heater*, 63 F.3d 311 (4th Cir. 1995)............................................34

*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016)........................................45

*United States v. Jaensch*, 665 F.3d 83 (4th Cir. 2011) ..........................................43

*United States v. Jamison*, 635 F.3d 962 (7th Cir. 2011).................................. 27, 30

*United States v. Kaczmarek*, 2023 WL 5105042 (E.D. Mich. Aug. 9, 2023) ................................................................................................................48

*United States v. Kelly*, 510 F.3d 433 (4th Cir. 2007).............................................17

*United States v. Lanier*, 520 U.S. 259 (1997)........................................................41

*United States v. Markey*, 393 F.3d 1132 (10th Cir. 2004)........................ 32, 33, 34

*United States v. Maynes*, 880 F.3d 110 (4th Cir. 2018)..........................................38

*United States v. Mazurie*, 419 U.S. 544 (1975)......................................................42

*United States v. McCartney*, 357 F. App'x 73 (9th Cir. 2009)......................... 49, 50

*United States v. Moody*, 2 F.4th 180 (4th Cir. 2021)........................................ 16, 27

*United States v. Moore*, 253 F.3d 607 (11th Cir. 2001) ...........................................44

*United States v. Moriello*, 980 F.3d 924 (4th Cir. 2020) ........................... 41, 42, 45

*United States v. Morningstar*, 456 F.2d 278 (4th Cir. 1972)....................................44

*United States v. Musso*, 914 F.3d 26 (1st Cir. 2019) ...............................................23

*United States v. Nyman*, 649 F.2d 208 (4th Cir. 1980)............................................34

*United States v. Passaro*, 577 F.3d 207 (4th Cir. 2009)..........................................37

*United States v. Perkins*, 2008 WL 4372821 (D. Neb. Sept. 23, 2008) .......... 49, 50

*United States v. Perkins*, 470 F.3d 150 (4th Cir. 2006)...........................................26

*United States v. Rafiekian*, 991 F.3d 529 (4th Cir. 2021)........................................16

*United States v. Recio*, 884 F.3d 230 (4th Cir. 2018)..............................................35

*United States v. Rogers*, 270 F.3d 1076 (7th Cir. 2001)................................... 19, 23

*United States v. Rose*, 522 F.3d 710 (6th Cir. 2008) ....................................... 19, 23

*United States v. Royce*, 2023 WL 2163677 (D.N.D. Feb. 22, 2023)......................48

*United States v. Ruiz*, 253 F.3d 634 (11th Cir. 2001)..............................................29

*United States v. Saleem*, 659 F. Supp. 3d 683 (W.D.N.C. 2023) ..........................48

*United States v. Saunders*, 828 F.3d 198 (4th Cir. 2016) .......................................43

*United States v. Siemers*, No. 99-4928, 2000 WL 864208 (4th Cir. June 29, 2000)...........................................................................................23

*United States v. Springer*, 609 F.3d 885 (6th Cir. 2010) ........................................39

*United States v. Syverson*, 90 F.3d 227 (7th Cir. 1996)................................... 19, 23

*United States v. Tresvant*, 677 F.2d 1018 (4th Cir. 1982) ......................................17

*United States v. Villalobos*, 2023 WL 3044770 (D. Idaho Apr. 21, 2023) ..............................................................................................................48

*United States v. Williams*, 364 F.3d 556 (4th Cir. 2004)........................................44

*United States v. Williams*, 553 U.S. 285 (2008) .................................. 41, 42, 44, 45

*United States v. Wilson*, 979 F.3d 889 (11th Cir. 2020)................................... 27, 29

*United States v. Young*, 989 F.3d 253 (4th Cir. 2021)............................................19

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ...............................44

**Statutes**

18 U.S.C. § 841(d) ...............................33

18 U.S.C. § 842(i)(1) ...............................32

18 U.S.C. § 921(a)(25) ............................... passim

26 U.S.C. § 5801 ...............................1

26 U.S.C. § 5821 ...............................26

26 U.S.C. § 5822 ...............................26

26 U.S.C. § 5841 ...............................5

26 U.S.C. § 5841(a) ...............................39

26 U.S.C. § 5845(a) ...............................28

26 U.S.C. § 5861(d) ............................... passim

26 U.S.C. § 5871 ...............................5

**Other Authorities**

Maxim Bans Gun Silencer, N.Y. TIMES, May 8, 1930 ...............................50

Robert J. Spitzer, *Gun Accessories and the Second Amendment:
    Assault Weapons, Magazines, and Silencers*, 83 L. & Contemp.
    Probs. 231 (2020) ............................... 49, 50

Robert J. Spitzer, *Gun Law History in the United States and Second
    Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017) ...............................52

Webster's Third New International Dictionary (2002) ...............................20

**Rules**

Fed. R. Crim. P. 52(a) ...............................34

Fed. R. Evid. 403 ...............................31

**Treatises**

1 Wayne R. LaFave, Substantive Criminal Law (3d ed.) ...............................30

**Regulations**

27 C.F.R. § 479.101 ...................................................................39

27 C.F.R. § 479.61 .....................................................................26

27 C.F.R. § 479.64 .....................................................................26

**Constitutional Provisions**

U.S. Const. amend. II ...................................................... 46, 47, 51

## Introduction

The National Firearms Act, 26 U.S.C. § 5801, et seq. (the "NFA"), establishes a comprehensive framework governing, among other things, the possession, transfer, and registration of firearms. As relevant here, 26 U.S.C. § 5861(d) prohibits any individual from receiving or possessing a firearm which is not registered to him in the National Firearms Registration and Transfer Record (the "NFRTR").

The defendant, Hatchet M. Speed, came to the attention of federal authorities following his participation in the incursion at the United States Capitol Building on January 6, 2021. In the ensuing investigation, law enforcement identified Speed as a naval reservist holding a top-secret security clearance. Shortly after January 6, Speed began "panic buying" firearms. Seeking to avoid the NFA and NFRTR, Speed purchased three devices from Hawk Innovative Tech. Although marketed as gun-cleaning accessories, these devices were in fact, as Speed later admitted, firearm silencers that became fully operable with one simple modification.

A jury convicted Speed of violating the NFA by possessing unregistered silencers. On appeal, Speed challenges his convictions on multiple grounds, most of which are premised on the theory that silencers must be operable to fall within § 5861(d). Because Speed's challenges lack merit, this Court should affirm.

1

**Issues Presented**

1.      Does sufficient evidence support Speed's convictions for knowingly possessing unregistered silencers?

2.      Did the district court abuse its discretion by excluding Speed's mistake-of-law evidence?

3.      Did the district court correctly instruct the jury on the definition of a "firearm silencer" under 18 U.S.C. § 921(a)(25) by reading the statutory text and a summary of the applicable caselaw?

4.      Is the definition of "firearm silencer" in 18 U.S.C. § 921(a)(25) unconstitutionally vague as applied to Speed's conduct?

5.      Does the NFA's requirement that silencers be registered and its prohibition on possessing unregistered silencers violate the Second Amendment?

**Statement of the Case**

A.      **Speed's Purchase of the Unregistered Silencers from Hawk Innovative Tech**

On January 6, 2021, Speed breached the U.S. Capitol building in order to obstruct Congress's certification of the Electoral College vote. JA94. Shortly thereafter, he began a spree of "panic buying" firearms and firearm accessories, JA1227, purchasing over $40,000 worth of firearms and supplies. JA1215. On February 15, 2021, he purchased four legal, registered silencers from Silencer Shop. JA937. About a month later, on March 11, Speed learned from the retailer

2

that it might take up to one year for the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to approve his application and allow him to take possession of the silencers. JA250, JA940. A few days later, on March 17, Speed placed an order from online retailer Hawk Innovative Tech ("HIT") for three devices marketed as "particulate filters" or "solvent traps." A "particulate filter," "solvent trap," or "patch trap" is a "device that attaches to the end of a gun's barrel to catch (trap) cleaning fluids (solvents) and cleaning materials (patches) during the cleaning process." JA1215. Although HIT marketed the three devices as "particulate filters" or "solvent traps," they were in fact firearm silencers in the same calibers as the legal silencers Speed had just purchased from Silencer Shop, which Speed would not receive for another year.[1] JA943. Although the three devices were marketed as "particulate filters" or "solvent traps" for cleaning firearms, they had—as Speed himself was well aware, JA1229-1230, JA1238-

_____

[1] A few weeks later, on April 14, 2021, the ATF seized the Hawk Innovative Tech website domain (along with HIT's remaining stock of unregistered silencers and silencer parts) through civil forfeiture. *See United States v. Assorted Firearm Silencers, Assorted Firearm Silencer Parts & the Domain Name Hawkinnovativetech.com*, No. 3:21-cv-00213-TCB (N.D. Ga.). Speed mistakenly cites a portion of the record referencing his trial counsel's date of *accessing* the HIT website (which at the time displayed a message saying that it had been seized by the ATF) for the proposition that the date of the actual domain seizure took place in between the two trials in this case (and implying some sort of impropriety on the part of the government). Def. Br. 17. In fact, ATF seized the domain roughly 20 months before the first trial.

1241—all of the objective design characteristics of firearm silencers and were
actually intended to be used as firearm silencers with a single, easily-accomplished
modification: drilling through a pre-marked, pre-sized, partially indented hole in
the front endcap to allow a projectile to pass through.  JA1006-1014, JA1031-
1042, SA1.

On March 23, 2021, Speed received the Hawk silencers via United States
Postal Service mail.  JA947.  Speed stored the devices, unopened, in his storage
unit, where they were eventually seized by the FBI.  JA868-869.

### B.    Speed's Meetings with the FBI Undercover Employee

In February 2022, Speed met for the first time with an FBI undercover
employee ("UCE") whom he knew as "Al."  JA839-840.  The UCE posed as a
likeminded firearms enthusiast with political views similar to Speed's.  JA840.  On
March 22, 2022, the UCE raised the subject of using "solvent, like, oil filters…[as
a] way to…circumvent suppressors."  JA1229.  Speed replied, "I bought a couple
of those.  You have to […] bore a hole, which I haven't done.  […] I figure, at least
I'm closer.  If I ever do need to use it, all I have to do is find someone with a drill
press."  JA1229-1230.

A few days later, on April 7, Speed discussed with the UCE his plans to
conduct kidnappings and to "wipe out" Jewish people in furtherance of his anti-
Semitic ideology, explaining that if only three percent of the public each attacked a

4

Jewish person, since Jews only make up two percent of the population, "[even] if…we're immediately arrested or killed or jailed or whatever […] we'd wipe out the opposition and leave the entire country free."  JA134, JA1234-1235.  During that conversation, the UCE asked, "You think at that point your…solvent traps would come in handy?"  Speed replied, "Yeah, that's the idea."  JA1232.

The UCE went on to ask Speed how to get the "solvent traps" that were actually silencers.  Speed explained that "Vienna Arsenal," a local firearms shop "has them, […] but you can also get them online.  […T]hey know why people are buying them….  […T]hey know that you're—why you're doing it.  […Y]ou don't have to say, uh, what it's for."  JA1238-1239.

### C.    Speed's Arrest

On September 6, 2022, a grand jury in the Eastern District of Virginia returned an indictment charging Speed with three counts of unlawful possession of a silencer that was not registered to him in the NFRTR, in violation of 26 U.S.C. §§ 5841, 5861(d), 5871. JA25-29.  The FBI arrested Speed the next day.

### D.    Speed's Motion to Dismiss

In October 2022, Speed filed a motion to dismiss the indictment, arguing that § 5861(d) was unconstitutionally vague as applied to him, and that it violates the Second Amendment of the U.S. Constitution under *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). The district court denied

5

Speed's as-applied challenge while specifying that he could renew it after trial. JA187. Speed never renewed his vagueness challenge. Likewise, the district court held, consistent with the weight of caselaw, that silencers do not constitute bearable "arms" under the Second Amendment. JA188. The district court thus denied Speed's motion to dismiss and the case proceeded toward trial.

### E.    December 2022 Pretrial Conference

In December 2022, the district court held a pretrial conference to resolve several disputed jury instructions. Speed objected to the government's proposed instruction that a silencer need not be operable to fall within the statute. JA302; JA304. The district court overruled the objection. JA348-JA351.

Also at issue at the pretrial conference were several motions in limine. The first, now at issue on appeal, was a motion by the government to preclude Speed from introducing mistake of law evidence pertaining to his incorrect belief that it was only illegal to possess a silencer if it was operable. JA355. The judge granted that motion and precluded Speed from introducing the mistake of law evidence.

### F.    First Trial

Trial began in December 2022. At the close of the first trial, Speed's counsel made an improper argument during her closing, arguing, contrary to the jury instructions, that the manufacturer's intent, rather than a device's objective design features, determined whether or not it was a silencer. JA558, JA560-561.

The government objected to those arguments at a bench conference immediately after Speed's closing and sought a curative instruction before proceeding to rebuttal. JA571-572. The district court agreed with the government and gave an instruction that was largely agreed to by both parties, JA582-584, and the case was passed to the jury. JA593. Despite the curative instruction, after several days of deliberation, the jury was unable to reach a verdict and the district court declared a mistrial.[2] JA641. The district court set the retrial for the following month.

### G.    Retrial

The second trial—the outcome of which is now on appeal—began on January 17, 2023.

The government presented uncontroverted expert testimony at trial explaining why the Hawk devices were silencers, not solvent traps. Specifically, the government offered unrebutted testimony from ATF Firearms Enforcement Officer Eve Eisenbise, a firearms expert whose job is to review devices submitted to the ATF by firearms manufacturers and law enforcement in order to make a

---

[2] Due to a juror conducting outside research and another juror missing a day of deliberations, two jurors were excused and alternates were seated during the course of these several days. In its final composition, the jury deliberated together for about one day before returning a note explaining that they were deadlocked, JA633. The district court then issued an *Allen* charge. JA635-637. Soon after, the jury returned another note stating that they were still unable to reach a verdict, and the district court declared a mistrial. JA639.

technical determination as to how they should be properly classified.  JA983-984.

Just as she would for a device submitted by a manufacturer for a classification

determination under the NFA, Eisenbise examined the three Hawk devices at issue

in this case to determine whether they were properly classified as silencers, by

looking at the objective characteristics of the device. JA987-988.

Eisenbise testified about several key design features that make a device a

silencer.  A silencer generally has a front endcap with a hole that allows the

passage of a projectile, JA995, a rear endcap that allows it to be attached to the

barrel of a firearm, JA996, and an internal "expansion chamber," that is, an area

inside the device that contains the propellant gases that are rapidly released into the

atmosphere when a gun is fired, which is one of the primary components of the

sound a listener perceives as a gunshot.  JA992.  The internal expansion chamber

in a silencer serves to contain those rapidly expanding propellant gases, giving

them time to diffuse before they are released into the atmosphere, thereby muffling

the sound of the report.  JA996.  Many silencers have expansion chambers in the

form of baffles in either a cone or a cup shape, which create many separate smaller

expansion chambers within the device.  JA998.  These baffles are often separated

by spacers, with the largest spacer, and therefore the largest expansion chamber,

closest to the rear endcap, where the device connects to the firearm barrel.

Eisenbise explained that this was called a "blast chamber," designed to be "a little

8

bit larger because that area is receiving the energy and pressure and heat of the projectile coming out of the barrel." JA1001-1002. The government introduced as exhibits two representative patents for firearm silencers showing how these elements are generally assembled within a silencer. JA994, JA1000, SA2-7.

Eisenbise testified that each of the three Hawk devices had threaded rear end caps designed to screw onto the muzzle of three different caliber firearms. JA1008. She also described how each device had internal cone-shaped baffles, with holes down the center of each baffle that would allow a projectile to pass through. JA1008. The Hawk devices had internal spacers to separate the baffles, with the largest spacer nearest to the rear end cap, consistent with the creation of a "blast chamber" closest to the muzzle of the gun. JA1010.

Eisenbise also explained the purpose, function, and design features of solvent traps. Solvent traps are designed to attach to the barrel of the firearm to catch solvent fluid while the firearm is being cleaned. JA1024. As Eisenbise explained, to clean the inside of a firearm barrel, one would use a rod to push either a cleaning patch with solvent cleaning fluid, or a bore brush, through the barrel of the firearm and out the end of the barrel. The purpose of a solvent trap, then, is to catch the dirty patch, and any solvent spray that might come out the end of the barrel. JA1029. Solvent traps are generally made out of clear or translucent plastic, so that a user can see the end of the rod and make sure that the patch or

9

bore brush has cleared the end of the gun barrel. JA1030. And, of course, a solvent trap would not have a hole in the front end cap; otherwise, it would not serve its stated purpose of containing solvent fluid.

Eisenbise explained why the Hawk devices have all of the characteristics of silencers, but would serve as exceptionally poor solvent traps. The three devices are opaque metal, not clear plastic, and have internal cone-shaped baffles with only a narrow, bullet-sized hole down the middle. SA1. Eisenbise explained that in order to use the Hawk devices as a solvent trap, one would have to blindly thread the patch or bore brush through narrow holes on the inside of an opaque device, without being able to see whether the patches were coming out clean, or whether the bore brush had fully cleared the barrel of the firearm, which would risk damaging the firearm. JA1038. Eisenbise explained that there would be a substantial number of obstacles to using the device to clean a firearm. JA1042. As she described, "the baffles not only serve no purpose to a solvent trap or filter, but they're contrary to that." JA1039. Eisenbise continued:

> Additionally, there's several screens that are, you know, purported to be in there for different layers of straining. So even if you did have enough [solvent fluid] to get through, it would have to make it through not just the first baffle, but, for some reason, several other -- what, five, six -- six baffles to find its way to the screen. So you would be -- at best, you might receive a minuscule amount of solvent in the bottom, maybe. And then to recycle this solvent, as the stated intent claims -- to recycle this dirty solvent to use again in a firearm, you would have to either -- you would have to remove the device, and then you'd have to tip it upside down, pushing -- pouring out or, you

10

> know, putting the solvent back from where it came, or remove the
> front end cap, in which case all of these parts, these baffles and
> spacers, would just fall immediately out.  And then if you have -- if
> you follow with patches, which you're going to do when you clean a
> barrel, you can't see when the clean patch has arrived, when the
> patches have come out clean, they would be arriving in this -- if they
> came off of the rod, they would be landing in the first compartment,
> the first expansion chamber, and they would soak up any minuscule
> amount of solvent that is there. So the baffles not only serve no
> purpose to a solvent trap or filter, but they're contrary to that.

JA1038-1039. Furthermore, Eisenbise testified that a typical clear plastic solvent

trap would cost $15-30, whereas the Hawk devices cost roughly $300.  JA1031.

The uncontroverted expert testimony established that the Hawk devices

make very poor solvent traps. Furthermore, Eisenbise testified that the Hawk

devices actually make extremely effective firearm silencers.  Each device came

with a threaded rear end cap that would allow it to be screwed onto the barrel of a

firearm of a specific caliber. JA1007-1008.  Each was made from opaque metal,

JA1006-1007, and contained internal cone-shaped baffles and spacers to create a

larger chamber closest to the rear end cap, consistent with a blast chamber.

JA1008-1010.  The baffles inside the Hawk devices had center holes down the

middle, with each device having a different sized center hole corresponding to the

caliber of the projectile with which it was intended to be used.  JA1009, SA1.

The Hawk devices also had a unique feature on their front endcap: a

perfectly centered "blind hole" or "indexing hole"; that is, a partially drilled hole

marking the exact center of the front endcap and the exact size a projectile of the

appropriate caliber would need to pass through it.  JA1013-1014.  As Eisenbise

explained, in a silencer, the hole in the front endcap must be perfectly centered to

prevent the projectile from striking the device when the weapon is fired, and

ideally it would be no bigger than the size of the projectile to contain more of the

sound and suppress the noise of the report more efficiently.  JA1014.

Eisenbise testified as to the steps she took to convert one of the devices into

a functioning—and very effective—silencer, a process she explained took

approximately five minutes.  Eisenbise unscrewed the bolt from the front of the

endcap,[3] pulled out the screens resting there, JA1016, then used a vice on her

workbench[4] to hold the end cap in place while she drilled the rest of the way

through the indexing hole using a common hand drill.  JA1019-1020.

After completing the indexing hole, Eisenbise tested the silencer using the

ATF's standard equipment, which tests the decibel reading of the report of the

same firearm fired with and without the silencer attached.  The Hawk silencer

reduced the report of the firearm by 23.58 decibels, a level that she testified

---

[3] Eisenbise explained that the bolt was designed so that if it had been screwed tightly into the endcap, one would need an appropriately-sized Allen wrench to remove it, but that it was in fact screwed in so loosely that she was able to remove it just by unscrewing it with her fingers.  JA1015.

[4] Eisenbise testified that it would not have been necessary to use the vice in order to drill the hole, but that regardless she used a standard, commercially available vice.  JA1019.

rendered it an "extremely effective" silencer.  JA1020-1022.  On redirect,
Eisenbise testified once again, that the Hawk devices were not "dual-use items"
that could be used as either a solvent trap or a silencer.  Rather, she clarified, they
would be effectively useless as a solvent trap, but have all the features and
characteristics of a firearm silencer.  JA1087-1089.

The jury returned guilty verdicts on all three counts on January 18, after
about two hours of deliberation. JA1219.

### H.    Motion for New Trial and Sentencing

After trial, Speed moved for a new trial, objecting once again to the district
court's exclusion of evidence of his belief that it was not illegal to possess the
silencers until they were operable.  The district court denied the motion. In its
ruling, the district court concisely boiled this issue—the beating heart of the
arguments now on appeal—down to its essence:

> The Court notes that Defendant does not argue that he believed he was
> purchasing run-of-the-mill solvent traps with which to clean his
> firearms or even that he never intended to complete the process of
> converting the devices into fully functioning silencers. Defendant only
> argues that he did not believe an inoperable silencer was nonetheless a
> "silencer" as defined by the National Firearms Act. In other words,
> Defendant believed that he had found a loophole in the law that
> permitted [him] to possess these devices. […H]e had not.

13

JA1220. In April 2023, Speed was sentenced to 36 months' incarceration.[5]  This

appeal followed.

## Summary of Argument

This district court properly applied the law governing the possession of

unregistered silencers, and correctly instructed the jury on that law.  To prove a

defendant guilty of violating 26 U.S.C. § 5861(d), the government must prove four

elements.  First, that the defendant knowingly possessed the silencer.  Second, that

the device was a silencer as defined by law.  Third, that the defendant knew the

characteristics of the firearm that brought it within the scope of the law.  And

fourth, that the firearm was not registered to the defendant in the NFRTR.  A

silencer is defined as "any device for silencing, muffling, or diminishing the report

of a portable firearm, including any combination of parts, designed or redesigned,

and intended for use in assembling or fabricating a firearm silencer or firearm

muffler."  18 U.S.C. § 921(a)(25).  The relevant caselaw makes clear that a device

does not need to be operable to constitute a silencer, so long as its purpose is to

silence, muffle, or diminish the report of a portable firearm.  To determine the

purpose of the device, the factfinder must look to the objective characteristics of

---

[5] On the separate charges out of the District of Columbia relating to Speed's breach of the U.S. Capitol on January 6, 2021, Speed was sentenced to 48 months' incarceration, to be served consecutively with the sentence on the instant conviction.  JA72.

the device.

Speed repeatedly complains about the manner in which the government chose to conduct the investigation and put on its evidence. But those claims are a distraction. The core of his argument is simple. Speed argues that the Hawk devices cannot be silencers under § 921(a)(25)—either because they are inoperable, or because the steps required to completely drill the indexing hole render them not just "inoperable," but somehow not silencers at all. Almost all of Speed's arguments proceed from that premise. But when considered under the appropriate standards of review, because the law is clear that the devices need not be operable to be "silencers," the overwhelming weight of the evidence proved that the devices were in fact silencers, as the jury reasonably found. Because the devices need not be operable to be silencers, the district court correctly excluded Speed's mistake of law defense—that he did not believe the devices qualified as firearms under the NFA until the indexing hole was fully drilled. Because the devices need not be operable to be silencers, the jury instructions properly stated the law. And because the devices need not be operable to be silencers, the statutes clearly applied to Speed's conduct and are not unconstitutionally vague.

All that remains, then, is Speed's *Bruen* argument—that the NFA's requirement that silencers be registered violates the Second Amendment to the Constitution. This argument is against the overwhelming weight of caselaw, which

holds that silencers do not constitute "bearable arms" under the Second Amendment, and that even if they did, a statute simply requiring registration—not forbidding their possession altogether—is a reasonable restriction on that right.

Accordingly, this Court should affirm.

**Argument**

### I.    The Government Introduced Sufficient Evidence to Prove that Speed Knowingly Possessed an Unregistered Silencer.

A defendant "bears a heavy burden" to support an argument that evidence was insufficient to sustain the convictions. *United States v. Dennis*, 19 F.4th 656, 665 (4th Cir. 2021); *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997). The Court "must affirm a conviction when substantial evidence viewed in the light most favorable to the prosecution supports the verdict," and should not "weigh evidence or credibility." *United States v. Barringer*, 25 F.4th 239, 252 (4th Cir. 2022) (quoting *United States v. Moody*, 2 F.4th 180, 189 (4th Cir. 2021)). "'[I]f any trier of fact could have found that the evidence—either direct, circumstantial or a combination of both—along with any reasonable inference[s]' established the essential elements of the crime beyond a reasonable doubt," the Court must uphold the jury's verdict. *United States v. Rafiekian*, 991 F.3d 529, 547 (4th Cir. 2021) (quoting *United States v. Fall*, 955 F.3d 363, 377 (4th Cir. 2020)). In reviewing the evidence, the Court must assume that the jury "resolved any discrepancies in favor of the government, rather than attempting to re-weigh the evidence or assess the

16

credibility of witnesses." *United States v. Kelly*, 510 F.3d 433, 440 (4th Cir. 2007). In short, the Court must affirm if "any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982).

The evidence against Speed was overwhelming. Though Speed makes a sufficiency claim on appeal, his arguments are largely legal, not factual. Notably, most of the facts and elements are undisputed, both below and on appeal. When taken in the light most favorable to the government, there was overwhelming evidence to support the jury's finding of guilt.

The government was required to prove four elements to sustain a conviction under § 5861(d). First, that the defendant knowingly possessed the device. Second, that the device was a silencer under the law. Third, that the defendant knew of the characteristics of the device that made it a silencer under the law. And fourth, that the silencers were not registered to the defendant in the NFRTR. JA809. The first and fourth elements—that Speed knowingly possessed the devices, and that they were not registered to him in the NFRTR—were undisputed at trial and are undisputed on appeal. What remains, then, are the second and third elements: whether sufficient evidence established that the devices were silencers, and whether sufficient evidence demonstrated that Speed knew the characteristics that made them silencers. The government presented overwhelming, and largely

17

uncontroverted, evidence of both elements.

### A.    The jury correctly found that the Hawk devices constituted silencers under 18 U.S.C. § 921(a)(25).

#### 1.    Section 921 sets forth three separate tests for determining when a device, combination of parts, and single part qualify as a silencer.

The NFA defines a firearm silencer as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a [silencer], and any part intended only for use in such assembly or fabrication."  18 U.S.C. § 921(a)(25). This definition provides three alternative tests, and Speed does not contest that framework.  *See, e.g.*, *United States v. Crooker*, 608 F.3d 94, 97 (1st Cir. 2010); Def. Br. 29-30.  Thus, the government must prove that a device is either (1) a device for silencing, muffling or diminishing the report of a firearm; (2) a combination of parts intended for use in assembling a silencer; or (3) a part intended only for use in that assembly.  Here, the government argued that the Hawk devices plainly met the first test, but that in the alternative they would also meet the second.  JA186, JA1136, JA1140.

#### 2.    The first test focuses on the *purpose* of the device in determining whether it constitutes a silencer.

The first test, and the one primarily at issue here, focuses on the purpose of the device to determine whether it is a silencer.  Here, the statutory text is plain: a

18

silencer is a "device *for* silencing, muffling, or diminishing the report of a portable firearm." § 921(25) (emphasis added). By the plain language of the statute, a device is a silencer if its purpose is to silence, muffle, or diminish the report of a portable firearm. *See Crooker*, 608 F.3d at 97; *United States v. Rose*, 522 F.3d 710, 720 (6th Cir. 2008); *United States v. Carter*, 465 F.3d 658, 667 (6th Cir. 2006); *United States v. Rogers*, 270 F.3d 1076, 1081-82 (7th Cir. 2001); *United States v. Syverson*, 90 F.3d 227, 232 (7th Cir. 1996). This interpretation is faithful to the statutory text's focus on what the device is *for*—its purpose—as opposed to "statutory language such as 'is capable of silencing' or 'that silences,'" which would indicate a focus on the device's functionality. *Carter*, 465 F.3d at 667.

### 3. The jury determined the purpose of the device by looking at its objective design features.

The plain meaning of § 921(a)(25) demonstrates that, in determining whether the purpose of a device is to silence, muffle, or diminish the report of a portable firearm, the focus is on the design of the device. The first clause of the statute defines a silencer to mean "any device for silencing, muffling, or diminishing the report of a portable firearm." § 921(a)(25). Because the term "device" is not statutorily defined, the Court "must give the word its 'ordinary meaning,'" which can be gleaned from reviewing relevant dictionary definitions. *United States v. Young*, 989 F.3d 253, 259 (4th Cir. 2021) (quoting *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012)). As used in this statute, the

19

ordinary meaning of device is "a piece of equipment or a mechanism *designed* to serve a special purpose or perform a special function." Device, Webster's Third New International Dictionary 618 (2002) (emphasis added). When given its plain and ordinary meaning, the first clause of the statute reflects that the purpose of the device is determined by its design characteristics.

Here, the uncontroverted expert testimony established that the objective design features of the Hawk devices—the baffles, spacers, and expansion chambers—made them very effective silencers, and practically useless as solvent traps or particulate filters. In the form that they were seized, before the indexing holes were fully drilled, the Hawk devices were inoperable silencers. That is, they needed one easily-accomplished modification—drilling through a small hole, pre-marked by Hawk—to convert them into functional silencers. The marketing claims by the manufacturer, that the devices were "particulate filters" or "solvent traps," were nothing more than sophistry, a thinly veiled subterfuge designed to evade the law, and the jury immediately recognized them as such. So did Speed. As he told the UCE, "[…T]hey know why people are buying them…. […T]hey know that you're—why you're doing it. […Y]ou don't have to say, uh, what it's for." JA1238-1239.

The uncontroverted expert testimony established that the devices were "extremely effective" silencers when the indexing hole was fully drilled. JA1020-

1022.  And that same uncontroverted testimony established that the devices would have been worse than useless as a particulate filter or solvent trap—they were not "dual-use" items that could be used for either purpose. JA1038-1039, JA1087-1089.  Speed argues that the "devices functioned as gun cleaning containers but could not be assembled…into a working silencer without…modification."  Def. Br. 42-43.  But nothing in the record supports this claim.  The only evidence on this subject in the record is the expert testimony of Eve Eisenbise, who specifically testified that the devices would *not* have functioned as gun cleaning containers and were *not* dual-use items.

Taken in the light most favorable to the government, the reasonable inference that must be drawn is that Hawk marketed these devices as "solvent traps" or "particulate filters" solely as a ruse to avoid law enforcement detection.  There is no reason that a particulate filter would need baffles forming internal expansion chambers, because the baffles would serve only to impede the motion of the cleaning rod with the patches or bore brush.  But there is every reason that a silencer would need internal expansion chambers, because that is the feature that makes it function to muffle the report of the gunshot.  There is no reason that a particulate filter would need holes down the internal baffles that are precisely the size of the corresponding caliber of bullet—a cleaning rod is not so specific as to size.  But there is every reason a silencer would need holes exactly the right size

21

for a projectile to pass through.  There is no reason that a particulate filter would be

made out of opaque metal—it is both expensive, and impedes the ability to see

whether the cleaning rod has passed all the way out of the barrel of the gun, and

whether the patches are coming out clean or not.  As Eisenbise testified, it risks

damaging the firearm if you cannot see whether the bore brush has cleared the

muzzle end of the barrel.  JA1027-1028.  But there is every reason a silencer would

be made of metal, to withstand the heat and energy of a gunshot.  There is no

reason that a particulate filter would need a partially-drilled indexing hole through

the front endcap—a hole in the bottom would defeat its entire stated purpose of

containing the solvent fluid.  But, of course, a silencer requires a hole for the bullet

to pass through, and if a manufacturer wants the purchaser to finish drilling that

hole themselves, it would need to be precisely measured and marked, as this one

was.  When the evidence is taken in the light most favorable to the government,

there can be no other conclusion except that the devices were silencers—though

admittedly inoperable ones until after the indexing hole was completely drilled—

and not solvent traps.

### 4.    Under the text of the statute, a device does not need to be operable to qualify as a silencer.

The statutory text of the NFA reflects that a device does not have to be

operable to qualify as a "silencer." As explained above, the text of the statute

focuses on what the device is *for*, as opposed to using "language such as 'is

22

capable of silencing' or 'that silences.'" *Carter*, 465 F.3d at 667. That "word choice indicates a concern for the purpose of the mechanism, and the parts thereof, not the function." *Id*. "Where Congress wanted to define a device by its capability, it said so explicitly." *United States v. Musso*, 914 F.3d 26, 31 (1st Cir. 2019) (holding that a grenade with an inoperable fuse constituted a "destructive device"). Thus, as multiple courts have recognized, a device need not be operable to constitute a silencer, as long as its purpose is to silence, muffle, or diminish the report of a portable firearm. *See Rose*, 522 F.3d at 720 ("We have also specifically held that a defendant may be found guilty of violating 26 U.S.C. § 5861(d) for the possession of a non-functioning silencer."); *Carter*, 465 F.3d at 667; *Rogers*, 270 F.3d at 1081-82; *United States v. Siemers*, No. 99-4928, 2000 WL 864208, at *1 (4th Cir. June 29, 2000); *Syverson*, 90 F.3d at 232 (rejecting argument that statute only prohibits silencers that work as "contrary to the plain language of the statute ... [which] defines a silencer as 'any device *for* silencing, muffling, or diminishing' the report of a firearm ... [and] does not limit the definition of silencer to 'a device *that* silences, muffles, or diminishes'" (emphasis in original)); *United States v. Hawkins*, 2022 WL 743571, at *5 (N.D. Ohio Mar. 11, 2022).

When the jury weighed the evidence, it correctly concluded that the Hawk devices were silencers even though they required one additional step to make them operable. In making this determination, the jury considered Eisenbise's expert

testimony regarding the ease with which she converted the devices into fully-functional, "extremely effective" silencers—a process she testified took about five minutes and could be accomplished with a simple, off-the-shelf hand drill from Home Depot. Eisenbise described how she unscrewed the bolt on the front end cap using her fingers, and pulled out the loose screens. Then she used a common hand drill to complete the indexing hole by drilling the rest of the way through. At that point, the device was a fully operational silencer. JA1016-1020.

Given the overwhelming evidence before it, the jury reasonably concluded that the ease with which the device could be modified into functionality meant that it was, factually, a firearm silencer under the statute.

### B.    The government proved that Speed knew the Hawk devices had the characteristics of a silencer.

Likewise, the evidence was overwhelming and uncontroverted that Speed knew that the devices possessed the characteristics of a silencer. Speed repeatedly said as much to the UCE. JA1229-1230, JA1238-1241. The UCE described the solvent traps devices to Speed as "a way to—to circumvent suppressors." His response was, "I bought a couple of those." JA1229. When the UCE asked Speed if you could "get more than one round through them and they still stay quiet," Speed responded, "[Y]eah, uh, they stay quiet." JA1238. He was plainly aware of the subterfuge being used by the manufacturers, explaining that the gun stores "know why people are buying them." JA1238-1239.

24

In addition to Speed's own words, the jury also considered evidence of the timing of his purchase of the Hawk silencers. As explained above, only days after learning that the registered silencers he had ordered from Silencer Shop would not arrive for another year, he purchased the Hawk silencers, for the same caliber firearms as the Silencer Shop silencers. The jury could reasonably draw the inference that Speed purchased the Hawk silencers to circumvent the wait time for the Silencer Shop silencers—and that therefore he knew that the Hawk devices were indeed silencers.

The *only* reasonable inference that can be drawn from this sequence, coupled with Speed's statements to the UCE, is that he knew that once the hole was drilled the devices would serve as silencers. It is therefore irrelevant that Speed claims he believed the devices had to be operational to fall within the statute.

The government has consistently argued that the Hawk devices meet the first prong of the statutory test; that is, that they are themselves devices that suppress the report of a firearm. But in the alternative, the government has argued that they meet the second prong of the statutory test; that is, that they are a combination of parts *intended* for use in assembling a silencer. Here, taking the evidence in the light most favorable to the government, the evidence was more than sufficient to prove that the combination of parts was *intended* for use in assembling a silencer. Speed even made clear to the UCE that he intended to complete the assembly of

the silencer should the need arise. As he stated, "If I do ever need to use it, all I have to do is find somebody with a drill press." JA1230. And, as already discussed, a reasonable jury could certainly find that there was no other plausible use for the device, which the expert had testified was effectively useless as a solvent filter.

For these reasons, the Court should not disturb the jury's verdict.

## II.    The District Court Did Not Abuse Its Discretion in Excluding Evidence Concerning Speed's Mistaken Belief that a Device Had to Be Operable to Require Registration as a Silencer.

This Court reviews evidentiary rulings for abuse of discretion. *United States v. Perkins*, 470 F.3d 150, 155 (4th Cir. 2006). At trial, Speed sought to introduce evidence that he mistakenly believed it was not illegal to possess the silencers until they were operational. Specifically, Speed sought to introduce the following statement to the UCE: "Once you drill a hole in the end without filling out the Form 1, you're a felon."[6] The district court correctly excluded this evidence, concluding that it furthered an improper mistake-of-law defense. This issue was heavily litigated throughout the proceedings, and the bulk of the questions now

---

[6] Individuals who want to make an NFA-covered firearm must follow certain procedures. A firearm may not be made unless the maker files an application, called a Form 1, with the ATF and pays a tax. *See* 26 U.S.C. §§ 5821–5822; 27 C.F.R. §§ 479.61–479.64. The ATF Director must approve the application before the firearm may be made. *See* 27 C.F.R. § 479.64; JA129.

raised on appeal are entwined with this issue.  The facts and the law, however, are straightforward.

Here, it is undisputed that Speed knew the objective design features of the device that made it a silencer.  He said as much to the UCE.  Speed obtained a device he *knew* was an inoperable silencer, apparently believing that he had found a loophole in the law that allowed him to legally possess an unregistered silencer so long as he stored it in an inoperable form.  But his "loophole" was not a loophole, and, as established above, the law in fact forbids possessing an unregistered silencer whether or not it is operable.

Speed argues that this reading of the statute creates a "strict liability" or "near strict liability" standard.  It does not.  Rather, according to well-established law, the government must "prove that [the defendant] knew of the features of his [firearm] that brought it within the scope of the [National Firearms] Act."  *Staples v. United States*, 511 U.S. 600, 619 (1994).  This is the standard intent element applicable to statutes, like the NFA provision here, that are silent as to *mens rea*. *Id*.  As the district court correctly held,

> a prosecutor need only prove "knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 193 (1998). Not knowledge of the law. *United States v. Moody*, 2 F.4th 180, 197–98 (4th Cir. 2021). Not knowledge of what constitutes a "firearm." *United States v. Wilson*, 979 F.3d 889, 904 (11th Cir. 2020). And not that the defendant knew he needed to register the device but chose not to do so. *United States v. Jamison*, 635 F.3d 962, 968 (7th Cir. 2011).

27

JA1221.

### A. The district court properly excluded the evidence as relevant only to an improper mistake-of-law defense.

Section 5861(d) is silent on the mental state necessary to commit the offense. It simply states that "[i]t shall be unlawful for any person . . . to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." § 5861(d). The term "firearm" includes "any silencer (as defined in section 921 of title 18, United States Code)." 26 U.S.C. § 5845(a)(7). Section 921, in turn, defines the term "firearm silencer" to "mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25).

In *Staples*, the Supreme Court addressed the necessary mental state that the

government must establish to prove a violation of § 5861(d).[7]  Relying on the

general common-law rule that a criminal offense requires proof of a *mens rea*, the

Court determined that "the usual presumption that a defendant must know the *facts*

that make his conduct illegal should apply." *Staples*, 511 U.S. at 619 (emphasis

added). The Court therefore held that "to obtain a conviction, the Government

should have been required to prove that [the defendant] knew of the features of his

[firearm] that brought it within the scope of the [National Firearms] Act." *Id*.

To satisfy this requirement, the government has to prove only "knowledge of

the facts that constitute the offense," not knowledge of the law. *Bryan v. United

States*, 524 U.S. 184, 193 (1998). There is no requirement that the defendant

"knew what features define a 'firearm' under 26 U.S.C. § 5845(a)." *United States

v. Wilson*, 979 F.3d 889, 904 (11th Cir. 2020) (quoting *United States v. Ruiz*, 253

F.3d 634, 638 n.4 (11th Cir. 2001)) (internal quotation marks omitted). Nor does

---

[7] Speed devotes a lengthy portion of his brief to discussing *Staples*, claiming that both the government and the district court have misunderstood its holding, and that it actually supports the defense.  This is wrong, and misunderstands either the holding of *Staples*, the opinion of the district court, or both.  In *Staples*, the defendant knew that he possessed the AR-15, but did not know that it had the ability to fire fully automatically with a single pull of the trigger.  *Staples*, 511 U.S. at 603.  That is to say, he did not know that the firearm had the characteristics that required registration under the statute.  Here, Speed knew the exact characteristics of the Hawk devices that made them silencers; he purchased them for that very reason.  He just believed—incorrectly—that the silencers did not require registration until he completed the final step to make them operable.

the government have to prove that the defendant "knew the firearm must actually be registered because of 26 U.S.C. §§ 5861(d) and 5845(a)." *United States v. Jamison*, 635 F.3d 962, 968 (7th Cir. 2011).

Because the *mens rea* element of the offense does not require knowledge of the law, mistake of law is not a proper defense in a prosecution under § 5861(d). When considering the viability of a mistake-of-law defense, "the basic rule is extremely simple: ignorance or mistake of . . . law is a defense when it negatives the existence of a mental state essential to the crime charged." 1 Wayne R. LaFave, Substantive Criminal Law § 5.6(a) (3d ed.). For § 5861(d) offenses, the mental state requires only that the defendant "knew of the features of his [firearm] that brought it within the scope of the [National Firearms] Act," a factual matter that does not require knowledge of the law. *Staples*, 511 U.S. at 619 (emphasis added). Thus, under § 5861(d), "ignorance of the law or a mistake of law is no defense to criminal prosecution." *United States v. Cox*, 906 F.3d 1170, 1190 (10th Cir. 2018).

With these background principles in mind, the district court properly excluded Speed's statement to the UCE that, "if you drill [the device] and you don't submit the Form 1, then now you're a felon." As the court recognized, the evidence was not probative of Speed's knowledge of whether the device had the

features and characteristics of a silencer.[8] Instead, Speed's statement reflects a

belief that a device had to have the hole drilled (*i.e.*, be operable) to meet the legal

definition of a silencer and be subject to registration under the NFA. But, as

explained *supra*, a device does <u>not</u> have to be operable to qualify as a silencer

under federal law.  Thus, Speed's statement reflected a mistaken understanding of

the law and was properly excluded.

**B.**     **Even if the evidence had some probative value, the
district court did not abuse its discretion in excluding the
evidence under Rule 403.**

Even if the evidence had some relevance, the district court did not abuse its

discretion in excluding it because "its probative value [wa]s substantially

outweighed by a danger of . . . unfair prejudice, confusing the issues, [and]

misleading the jury." Fed. R. Evid. 403. Allowing such evidence would have

presented an undue danger that the jury would be swayed and distracted by

improper considerations of Speed's mistake of law. It also would have created a

significant risk of confusing the jury to think that the devices were not silencers

unless they were operable. *See United States v. Hardin*, 889 F.3d 945, 949 (8th Cir.

2018) (affirming the exclusion of evidence of the operability of a firearm on Rule

---

[8] And, to whatever extent it *is* probative of Speed's knowledge, the statement is
inculpatory, not exculpatory.  It shows that Speed plainly *knew* the device had the
features and characteristics of a silencer once the indexing hole was drilled,
because he knew it would be a felony to possess it without registration.

403 grounds); *United States v. Counce*, 445 F.3d 1016, 1019 (8th Cir. 2006)

(holding that "the evidence of firearm inoperability was properly excluded under

Rule 403 because such evidence would have yielded substantial juror confusion

without having significant probative value regarding the issue of weapon design").

The Tenth Circuit's decision in *United States v. Markey*, 393 F.3d 1132

(10th Cir. 2004), is instructive.[9] There, an acquaintance gave the defendant four

sticks of dynamite. *Id*. at 1134. The defendant, who used explosives while in the

military, concluded that the dynamite could not be detonated through conventional

methods. The defendant even tested one stick of the dynamite, and it did not

explode. The defendant therefore kept the remaining sticks of dynamite in his

apartment. *Id*. After his brother-in-law alerted law enforcement, the government

charged the defendant under 18 U.S.C. § 842(i)(1), which "makes it unlawful for

any person who has been convicted of a felony to 'possess any explosive which

has been shipped or transported in or affecting interstate . . . commerce.'" *Id*.

(quoting § 842(i)(1)). Based on relevance and Rule 403 grounds, the district court

granted the government's motion in limine to preclude the defendant from

introducing evidence that the dynamite was incapable of exploding. *Id*. The

---

[9] This Court has cited *Markey* approvingly in rejecting a defendant's argument
that, to prove that he received or possessed an explosive, the government had to
prove that his "blasting caps would or could explode." *See United States v. Goff*,
517 F. App'x 120, 122 (4th Cir. 2013).

defendant entered into a conditional plea and appealed the district court's ruling on the motion in limine. *Id*. at 1134-35.

In affirming the district court's ruling, the Tenth Circuit held that the defendant's "belief that the dynamite could not explode is irrelevant to whether he knowingly possessed an explosive for purposes of § 842(i)(1)." *Id*. at 1136. In reaching this conclusion, the Tenth Circuit observed that the government was required to prove that the defendant "knew the objects he possessed had the characteristics that brought them within the statutory definition of an explosive," *id*., the same *mens rea* that applies in this case. The Tenth Circuit noted that the question "[w]hether evidence of the dynamite's explosive capacity is relevant depends on whether the Government must prove that a particular device is capable of exploding to be classified as an 'explosive' under § 842(i)(1)." *Id*. "An 'explosive,' for purposes of § 842(i)(1), is 'any chemical compound mixture, or device, the primary or common purpose of which is to function by explosion; the term includes, but is not limited to, dynamite and other high explosives.'" *Id*. (quoting § 841(d)). Based on this definition, the Tenth Circuit determined that "the ordinary meaning of the terms 'primary or common purpose' connotes a device's intended and usual use—not its actual capability." *Id*. Thus, the Tenth Circuit concluded that "the Government need not show that a device is actually able to explode to prove that a defendant knowingly possessed an explosive under

33

§ 842(i)(1)." *Id*. The Tenth Circuit further rejected the defendant's argument "that because he believed in good faith that the dynamite could not explode, he should be exonerated," stating that this argument "appears to be one of ignorance of the law," a "type of argument [that] is 'easily rejected.'" *Id*. (citation omitted).

The Tenth Circuit's reasoning in *Markey* applies with equal force here. Just as the government did not have to prove the operability of the explosive in *Markey*, the government did not have to prove the operability of the silencers here. Speed's subjective understanding about the operability of the devices was therefore irrelevant. The district court acted well within its broad discretion in determining the evidence was inadmissible.

### C. Even if the district court erred in excluding the evidence, any error was harmless.

"Any error . . . that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). The standard for assessing harmlessness under Rule 52 is well settled. "An error is harmless if [the Court] can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018) (quoting *United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995)). Or, "[p]ut another way, an error is harmless if it's 'highly probable that [it] did not affect the judgment.'" *Id*. (quoting *United States v. Nyman*, 649 F.2d 208, 212 (4th Cir. 1980)). "The decisive factors to consider are

34

the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *United States v. Caldwell*, 7 F.4th 191, 204 (4th Cir. 2021) (quoting *Burfoot*, 899 F.3d at 340-41) (internal quotation marks omitted). And "[t]he overall strength of the government's evidence constitutes an important factor in this inquiry." *United States v. Recio*, 884 F.3d 230, 238 (4th Cir. 2018).

While Speed's knowledge was a key issue at trial, the government's evidence proving this element was strong. First, Speed made numerous statements to the UCE showing that he knew the devices were designed to be silencers. In recorded conversations with the UCE, Speed discussed the use of the so-called solvent traps to circumvent silencer restrictions. JA1229-1230, JA1238-1241. For example, when the UCE asked, "can you get more than one round through them, and they still stay quiet," Speed responded that he "ha[d] to test and see . . . but yeah, uh, they stay quiet." JA1238. Speed even confirmed to the UCE that he thought the devices would come in handy when taking violent action to "wipe out the opposition," JA1232-1235, proving that he knew the devices were designed to be silencers and not for cleaning firearm barrels. Speed's statements to the UCE left no doubt that he knew the devices were designed to serve as silencers and that he possessed them for that purpose.

Second, the context in which Speed purchased the Hawk devices proved that

35

he knew and intended for them to be silencers. The trial evidence showed that Speed was panic buying firearms after January 6, 2021, purchasing twelve firearms and spending, over four months, more than $40,000 at stores that sold firearms, firearm accessories, and ammunition. JA1215, JA1227. When he learned that the four silencers he purchased legally from Silencer Shop in February 2021—two silencers for a 9mm caliber firearm and two silencers for a .45 caliber firearm— would not be delivered for a year, he purchased, within days, the unregistered Hawk silencers. Notably, one device was for a 9mm and another was for a .45— the same caliber sizes that Speed was waiting to receive from his Silencer Shop purchase. JA250, JA937, JA940, JA943. Within a week, Speed received the Hawk devices. JA947. The reasonable inference was that Speed purchased the Hawk devices to circumvent the wait time for obtaining ATF approval for the transfer of silencers. This further proved that he knew the Hawk devices were designed to be silencers and bought them for that reason. In light of this evidence, the issue of Speed's knowledge was not close.

In addition to the strength of the government's case, the limited nature of the district court's ruling further shows that the exclusion of the evidence was harmless. Speed maintains that the district court erred in excluding one statement that he made to the UCE: "if you drill it and you don't submit the Form 1, then now you're a felon." But the government introduced other evidence demonstrating

that Speed knew the devices did not have a completed hole in the front end cap and that a hole needed to be drilled for the device to become a functional silencer. At trial, Speed argued in closing that the absence of a completed center hole showed that he did not know the devices were silencers. *See* JA1165 ("He didn't know they had the same characteristics as silencers, because everything that he was aware—their name, the inserts, the price, the screens, the lack of the hole—all of those things screamed these are solvent traps.").

Under these circumstances, it is not highly probable that the exclusion of Speed's single statement to the UCE affected the jury's verdict. Thus, even if the exclusion of that evidence was erroneous (which it was not), any error was harmless.

## III. The District Court Properly Instructed the Jury on the Definition of a "Firearm Silencer" Under 18 U.S.C. § 921(a)(25)

The decision whether to give a jury instruction and the content of that instruction are reviewed for an abuse of discretion. *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009).

The district judge correctly instructed the jury that the definition of a firearm silencer under 18 U.S.C. § 921(a)(25) included two alternative tests: that a silencer can be either: 1) "a device for silencing, muffling, or diminishing the report of a portable firearm"; or 2) "a combination of parts, designed or redesigned, and

37

intended for use in fabricating a firearm silencer."[10]  JA654.  Finally, the jury was

instructed that a device "does not need to be operable to constitute a silencer," as

long as its purpose—as determined by the objective design features of the device—

is to be a silencer.  JA655.  These instructions correctly stated the law.

### A.    The district court's instructions were consistent with the plain meaning of the statutory text.

The district court did not abuse its discretion in instructing the jury that the

definition of "silencer" can be either of the first two prongs of the statutory test.

Nor did it abuse its discretion by instructing the jury that a silencer's purpose is

determined by its objective design characteristics, and that it need not be operable

to qualify as a silencer under the law.  All of the instructions were consistent with

the statutory language and the weight of caselaw, and they correctly stated the law,

as explained in detail above. "The district court's instructions tracked the language

of the statute and adequately conveyed the required elements. By contrast,

[Speed]'s instruction is, at best, a misleading statement of the law." *United States

v. Maynes*, 880 F.3d 110, 113 (4th Cir. 2018).

---

[10] The third prong of the statutory test, "a part intended for use in assembling or fabricating a firearm silencer," was not at issue in this case and was not put before the jury in the instructions.

**B.    The district court's instructions were consistent with the purpose of the NFA.**

The purpose of the NFA "is to curb the proliferation of especially dangerous weaponry." *United States v. Springer*, 609 F.3d 885, 888 (6th Cir. 2010). Consistent with that purpose, the NFA defines "firearm" to include certain specifically listed weapons, including silencers.  *See* 26 U.S.C. § 5845(a).  The NFA requires that all covered firearms not in the possession of the United States be registered in the NFRTR. *See* 26 U.S.C. § 5841(a); 27 C.F.R. § 479.101.

A focus on the design of the device is consistent with the purpose of the NFA. Under this plain-meaning interpretation, people are prohibited from making or transferring devices that they know are designed to be used as silencers, unless they comply with the registration and taxation requirements in the NFA. This interpretation furthers the purpose of the NFA "to curb the proliferation of especially dangerous weaponry 'identifiable generally and broadly, if not exclusively, with criminal activities.'" *Springer*, 609 F.3d at 888 (quoting *United States v. Black*, 431 F.2d 524, 528 (6th Cir. 1970)).

In contrast, requiring proof of the subjective intent of the defendant, irrespective of the design of the device, would thwart that purpose. It would mean that people could make, transfer, receive, and possess devices that they knew were designed to be silencers—including fully operable commercial silencers—without registering them, as long as they did not intend for them to be used as silencers.

39

Given the purpose of the NFA to regulate the making and transfer of covered firearms, such an interpretation would defy common sense and lead to absurd results. And it is well established that the Court is to "avoid 'interpretations of a statute which would produce absurd results . . . if alternative interpretations consistent with the legislative purpose are available.'" *Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir. 2019) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)).

Therefore, the district court did not abuse its discretion in giving jury instructions which properly and precisely stated the relevant law.

## IV.    The Definition of "Firearm Silencer" in 18 U.S.C. § 921(a)(25) Is Not Unconstitutionally Vague.

This Court reviews vagueness challenges *de novo*. *United States v. Barronette*, 46 F.4th 177, 190 (4th Cir. 2022).

Speed first raised his vagueness argument in his motion to dismiss the indictment prior to the first trial.  The government argued in response that the court should defer ruling on the issue until trial because constitutional as-applied challenges to a statute, such as Speed's vagueness argument, are not suitable for pretrial resolution on a motion to dismiss when they depend on facts outside of the indictment.  JA71-72.  The district court denied the vagueness challenge without prejudice, holding that "as an as-applied [challenge], there are facts in dispute that need to be resolved." JA162-163.  The district court specifically stated that he was

40

"not precluding the defendant from re-raising this at an appropriate time."  JA163.

However, Speed never re-raised the vagueness challenge prior to this appeal.  As

explained below, § 921(a)(25) is not unconstitutionally vague as applied to Speed's

possession of the Hawk silencers.

The "[v]agueness doctrine is an outgrowth . . . of the Due Process Clause of

the Fifth Amendment." *United States v. Williams*, 553 U.S. 285, 304 (2008). To

satisfy due process, "a criminal statute must 'define the criminal offense with

sufficient definiteness that ordinary people can understand what conduct is

prohibited and in a manner that does not encourage arbitrary and discriminatory

enforcement.'" *United States v. Moriello*, 980 F.3d 924, 931 (4th Cir. 2020)

(quoting *Doe v. Cooper*, 842 F.3d 833, 843 (4th Cir. 2016)). "A statute is

unconstitutionally vague if it fails to give a person of ordinary intelligence fair

notice that his contemplated conduct is forbidden by the statute." *Barronette*, 46

F.4th at 190 (quoting *United States v. Bennett*, 984 F.2d 597, 605 (4th Cir. 1993))

(internal quotation marks omitted). "[T]he touchstone is whether the statute, either

standing alone or as construed, made it reasonably clear at the relevant time that

the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267

(1997).

Where, as here, a criminal statute does not involve First Amendment

freedoms, a vagueness challenge "must be examined in the light of the facts of the

41

case at hand." *Moriello*, 980 F.3d at 931 (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)). In such situations, defendants cannot assert a facial attack against a statute on vagueness grounds. *See id.* "[A] defendant who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Barronette*, 46 F.4th at 190 (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18-19 (2010)) (alterations and internal quotation marks omitted).

Speed argues that § 921(a)(25) is unconstitutionally vague because it does not sufficiently define what constitutes a "silencer" to put him on fair notice that his possession of the Hawk devices was unlawful. This argument lacks merit.

A common thread of all three elements of § 921(a)(25)'s definition of "silencer" is that the purpose of the device, part, or parts must be to silence, muffle, or diminish the report of a portable firearm, or to assemble or fabricate a device that does so. This focus on the purpose of the device or parts—and, at least in the context of a combination of parts, on the design—presents "clear questions of fact," a "true-or-false determination," not "wholly subjective judgments." *Williams*, 553 U.S. at 306. The statute's focus on the purpose of the device "is conventional with criminal statutes in order to provide fair notice" and "tempers problems of overbreadth and vagueness created by the multiple legitimate objects that can be used to silence a firearm." *Crooker*, 608 F.3d at 99.

42

The scienter requirement for proving a violation of § 5861(d) further safeguards against any vagueness concerns. It is well established that a knowledge requirement tends to defeat any vagueness concerns. *See, e.g.*, *United States v. Saunders*, 828 F.3d 198, 207 (4th Cir. 2016) ("A 'scienter requirement alone tends to defeat' vagueness challenges to criminal statutes."); *United States v. Jaensch*, 665 F.3d 83, 90 (4th Cir. 2011) ("Given that Section 1028(a)(1) has a scienter requirement specifically requiring the Government to prove beyond a reasonable doubt that [the defendant] knew that the ID appeared to be issued by or under the authority of the United States Government, this scienter requirement alone tends to defeat [his] vagueness challenge."). "[A] scienter requirement in a statute alleviates vagueness concerns, narrows the scope of its prohibition, and limits prosecutorial discretion." *McFadden v. United States*, 576 U.S. 186, 197 (2015) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007)) (alterations and internal quotation marks omitted).

To obtain a conviction under § 5861(d), the government must "prove that [the defendant] knew of the features of his [firearm] that brought it within the scope of the [National Firearms] Act." *Staples*, 511 U.S. at 619. With respect to silencers, then, the government must show that the defendant knew either (1) that the device was "for silencing, muffling, or diminishing the report of a portable firearm"; (2) that the "combination of parts" was "designed or redesigned, and

43

intended for use in assembling or fabricating a firearm silencer or firearm muffler"; or (3) that the single part was "intended only for use" in assembling or fabricating a firearm silencer or firearm muffler. *See United States v. Moore*, 253 F.3d 607, 610-11 (11th Cir. 2001). This scienter requirement defeats Speed's vagueness challenge by ensuring that he cannot be convicted for possessing devices that he was unaware had the attributes of a silencer as defined by the statute.

"[P]erfect clarity and precise guidance have never been required" to avoid vagueness concerns. *Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). And "a statute need not spell out every possible factual scenario with 'celestial precision' to avoid being struck down on vagueness grounds." *United States v. Claybrooks*, — F.4th —, 2024 WL 44928, at *5 (4th Cir. Jan. 4, 2024) (quoting *United States v. Hager*, 721 F.3d 167, 183 (4th Cir. 2013)). For this reason, the Court has rejected vagueness challenges to other firearm definitions that do not go into exceptionally great levels of granularity. *See United States v. Williams*, 364 F.3d 556, 560 (4th Cir. 2004) (rejecting a vagueness challenge to the NFA's definition of "machinegun"); *United States v. Morningstar*, 456 F.2d 278, 281 (4th Cir. 1972) (rejecting a vagueness challenge to the NFA's definition of "destructive device"). Here, as described above, the statute provides sufficient and readily understandable standards for determining when a device, parts, or part constitutes a "silencer."

44

Speed contends that the "possession of almost any household or automotive container with filter capabilities could be a "silencer," because it might be capable—with sufficient modification—of being transformed into a functioning firearm silencer." Def. Br. 45. "But [Speed] does not dispute the district court's holding that his conduct falls squarely within the confines of" § 921(a)(25). *United States v. Hasson*, 26 F.4th 610, 616 (4th Cir. 2022). By resorting to such hypotheticals, Speed "attempts to take [the Court] beyond the facts of [his] own case" and make an "inappropriate" facial challenge. *Moriello*, 980 F.3d at 931. "In criminal cases, . . . 'if a law clearly prohibits a defendant's conduct, the defendant cannot challenge, and a court cannot examine, whether the law may be vague for other hypothetical defendants.'" *Hasson*, 26 F.4th at 616-17 (quoting *United States v. Hosford*, 843 F.3d 161, 170 (4th Cir. 2016)); *see also Williams*, 553 U.S. at 305-06 (rejecting a lower court's reliance on hypotheticals to find a statute vague and explaining that the court's "basic mistake" was "the belief that the mere fact that close cases can be envisioned renders a statute vague").

As discussed above, Speed's conduct clearly falls within the statute's definition of "silencer." "He therefore cannot mount a facial challenge to the

statute." *Claybrooks*, — F.4th —, 2024 WL 44928, at *5.[11]

## V.    The NFA's Prohibition on Possessing Unregistered Silencers Does Not Violate the Second Amendment.

The Court reviews conclusions of law *de novo*. *United States v. Bolander*, 772 F.3d 199, 206 (4th Cir. 2013).

The Second Amendment of the Constitution provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "Like most rights," however, "the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). It does not allow every person to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. The *Heller* Court made clear that its opinion recognizing an individual right to possess a handgun for self-defense should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of

---

[11] Speed makes a one-paragraph attempt at challenging ATF's regulations and "other public guidance." Def. Br. 48. Speed does not specify which regulations or guidance he seeks to challenge, provides no relevant authority to support his challenge, and does not develop any argument to support his claim. Speed has therefore waived this argument. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument–even if its brief takes a passing shot at the issue.") (cleaned up).

firearms in sensitive places such as schools and government buildings, or laws

imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626-

27; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality)

(same).

> **A.    The Second Amendment does not protect Speed's conduct because silencers are not bearable "arms."**

The Second Amendment's protection applies to "Arms." U.S. Const. amend.

II. This protection "extends, prima facie, to all instruments that constitute bearable

arms, even those that were not in existence at the time of the founding." *Heller*,

554 U.S. at 582. The 18th-century meaning of the term "arms" involved

"[w]eapons of offence, or armour of defence," or "any thing that a man wears for

his defence, or takes into his hands, or useth in wrath to cast at or strike another."

*Id*. at 581 (internal quotation marks omitted). With this in mind, the *Heller* Court

noted that "the most natural reading of 'keep Arms' in the Second Amendment is

to 'have weapons.'" *Id*. at 582. More recently, the *Bruen* Court recognized that

"even though the Second Amendment's definition of 'arms' is fixed according to

its historical understanding, that general definition covers modern instruments that

facilitate armed self-defense." 142 S. Ct. at 2132.

As multiple courts have held, a silencer is not a "bearable arm" and therefore

falls outside of the plain text of the Second Amendment.  *See Cox*, 906 F.3d at

1186; *see also United States v. Saleem*, 659 F. Supp. 3d 683, 697 (W.D.N.C.

47

2023); *United States v. Kaczmarek*, 2023 WL 5105042, at *2 (E.D. Mich. Aug. 9, 2023); *Cox v. United States*, 2023 WL 4203261, at *7 (D. Alaska June 27, 2023); *United States v. Villalobos*, 2023 WL 3044770, at *11–*13 (D. Idaho Apr. 21, 2023); *United States v. Royce*, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023); *United States v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020); *United States v. Hasson*, 2019 WL 4573424, at *4 (D. Md. Sept. 20, 2019). "A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defense')." *Cox*, 906 F.3d at 1186. It "is not itself used 'to cast at or strike another,' it does not contain, feed, or project ammunition, and it does not serve any intrinsic self-defense purpose." *Hasson*, 2019 WL 4573424, at *4. Nor is a silencer necessary to the operation of a firearm, like ammunition, magazines, or even the availability of firing ranges, without which one could not train or qualify to exercise his Second Amendment rights. *See id*. at *4-5. An operable firearm will work perfectly well without a silencer, and a silencer will not transform an inoperable firearm into an operable one.

B.    **Even if considered "bearable arms," silencers are "dangerous and unusual weapons" that can be regulated consistent with the Second Amendment.**

Even if silencers were "bearable arms," the NFA's prohibition on possession of unregistered silencers falls within the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *see also*

*Bruen*, 142 S. Ct. at 2143-44. As such, it falls beyond the scope of Second

Amendment protection. *See United States v. McCartney*, 357 F. App'x 73, 76 (9th

Cir. 2009) (holding that silencers are "dangerous and unusual" and therefore fall

outside of the Second Amendment's protections); *United States v. Perkins*, 2008

WL 4372821, at *4 (D. Neb. Sept. 23, 2008) (same).

Silencers remain both dangerous and unusual—especially for self-defense

purposes—regardless of whether they existed at the time of the founding or are

comparable to any weapon that did. The historical record shows that silencers were

perceived as dangerous almost immediately after their invention and that they were

quickly used to facilitate crimes. *See* Robert J. Spitzer, *Gun Accessories and the*

*Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 L. &

Contemp. Probs. 231, 246-49 (2020). When the silencer was invented in the early

1900s and patented in 1908, "[o]bjections to civilian use of silencers appeared

almost immediately." *Id*. at 246. By 1909, just one year later, the first state, Maine,

had banned the sale or possession of silencers, and New Jersey followed two years

later with a prohibition on the use of silencers for hunting. *Id*. at 247. From the

beginning, there were "two primary concerns about unregulated possession of

silencers: that they would be used by criminals seeking to avoid detection, and that

they would be used by hunters with a similar motivation." *Id*. "From 1909 and

1936, at least fifteen states enacted silencer restrictions, with eight of them

specifically barring their use in hunting." *Id*. at 248. Ultimately, the inventor of the silencer "discontinued manufacturing silencers because of the popular impression that this invention was an aid to crime." *Id*. at 248 n.125 (quoting Maxim Bans Gun Silencer, N.Y. TIMES, May 8, 1930, at 27).

None of the concerns regarding silencers articulated in the early 20th century has changed such that silencers are no longer dangerous and unusual today. *See McCartney*, 357 F. App'x at 76; *Perkins*, 2008 WL 4372821, at *4. Even if silencers can provide some noncriminal benefit to protecting hearing and improving accuracy as Speed argues, such incidental benefits do not reduce the inherently high degree of dangerousness of devices that reduce the report of a firearm.

Consequently, the NFA restrictions of silencers that are at issue in this case fit within the historical tradition of prohibitions on "dangerous and unusual weapons" recognized by *Heller* and reemphasized in *Bruen*. Because silencers have always been, and remain, dangerous and unusual weapons, § 5861(d)'s prohibition on possession of unregistered silencers does not run afoul of the Second Amendment.

### C. The NFA's registration requirements do not "infringe" on the Second Amendment.

Even setting aside the question whether silencers are "bearable arms" or "dangerous and unusual weapons," the text of the Second Amendment commands

50

only that the right to keep and bear arms shall not be "infringed," not that such right cannot be regulated in any way. U.S. Const. amend. II. Here, the NFA's registration and taxation requirements do not "infringe" on the right to keep and bear arms. Individuals like Speed may receive and possess silencers as long as they comply with the registration and taxation requirements.

As described above, the NFA's registration requirements for silencers are no more burdensome than the kind of firearms registration requirements that the Supreme Court left intact in *Bruen*. Speed's statute of conviction does not ban possession of a silencer. Rather, it requires registration and documentation, as well as the payment of an appropriate, reasonable tax. Those who deliberately disregard these regulatory requirements may be subject to criminal penalties. Such a system does not "infringe" on the right to keep and bear arms, and therefore does not violate the Second Amendment.

### D.    The NFA's requirements are analogous to historical laws regulating firearms in commerce.

Finally, the NFA's registration requirement is analogous to historical laws regulating firearms in commerce, meaning that it satisfies both steps of the *Bruen* analysis. *See* 142 S. Ct. at 2130. "[C]olonial governments substantially controlled the firearms trade." *Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). For example, "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert J. Spitzer, *Gun Law History in the*

*United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 76 (2017). "A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also 'of arms and munitions.'" *Id*. In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony." *Id*. at 685 n.18 (emphasis added). And other colonies "controlled the conditions of trade" in firearms. *Id*. at 685. States continued to enact laws governing "the manufacture, sale, [and] transport" of guns and ammunition in the 18th and 19th centuries. *See* Spitzer, *Gun Law History*, supra, at 74.

Like the early laws, the NFA's registration requirement for silencers does not prohibit possession, but imposes record-keeping requirements to ensure they do not fall into the wrong hands or can be traced when used in a crime. Although not identical to the historical statutes, *Bruen* made clear that the government need only identify a "historical analogue, not a historical twin." 142 S. Ct. at 2133. Because the registration requirement is analogous to historical laws regulating firearms in commerce, § 5861(d) satisfies *Bruen*'s two-step test.

**Conclusion**

For the foregoing reasons, this Court should affirm Speed's convictions.

Respectfully submitted,

Jessica D. Aber
United States Attorney


_____ /s/ _____
Danya E. Atiyeh
Assistant United States Attorney

## Statement Regarding Oral Argument

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word.

I further certify that this brief does not exceed 13,000 words (and is specifically 12,995 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

_____
/s/

Danya E. Atiyeh
Assistant United States Attorney