**No. 23-4308**

_____

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

(1:22-cr-00165-MSN-1)
_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

HATCHET M. SPEED

Defendant - Appellant
_____

Appeal from the United States District Court

for the Eastern District of Virginia, (Hon. Michael S. Nachmanoff,
District Judge)

_____

**<u>REPLY BRIEF OF APPELLANT HATCHET M. SPEED</u>**


SUBMITTED BY:

Roger Roots, esq.
10 Dorrance Street, Suite #700
Providence, RI 02903
775-764-9347
Email: roger@rootsjustice.com
Counsel for Appellant Hatchet
Speed

# TABLE OF CONTENTS

I.    INTRODUCTION...........................................................4

A. The government misstates Speed's argument in its
introduction..................................................................4

B. The government's false depiction of Speed's
imaginative end-of-civilization hyperbole.................................9

C. Under the government's theory, <u>any household item</u>
could be designated a firearm silencer—and the
possession of such a household item could subject
its possessor to imprisonment...............................................10

D. The NFA's "destructive device" case law also discredits
the District Court's construction..........................................15

II.    THE FIFTH CIRCUIT RECENTLY WITHDREW A PRO-
GOVERNMENT RULING REGARDING SILENCERS AND
THE 2ND AMENDMENT...........................................................18

III.   CONCLUSION...............................................................20

# TABLE OF AUTHORITIES

*New York State Rifle & Pistol Association, Inc.
v. Bruen* case, 597 U.S. 1 (2022)...................................................19

*United States v. Copus*, 93 F.3d 269 (7th Cir. 1996).....................18

*United States v. Fredman*, 833 F.2d 837 (9th Cir. 1987)...............18

*United States v. Hammond*, 371 F.3d 776 (11th Cir. 2004)...........17

*United States v. Klebig*, 600 F.3d 700, 719 (7th Cir.
2009)....................................................................................11

*United States v. Peterson* (5th Cir., No. 24-30043)........................18

*United States v. Posnjak*, 457 F.2d 1110 (2d Cir. 1972)...............17

*United States v. Syverson*, 90 F.3d 227, 232 (7th Cir.
1996)....................................................................................11

*Vais Arms, Inc. v. Vais*, 383 F.3d 287 (5th Cir. 2004)....................11

**Secondary Authorities.**

Buckman, Elliot, "Just a Soul Whose Intentions Are Good? The Relevance of a Defendant's Subjective Intent in Defining a "Destructive Device" Under the National Firearms Act," 79 *Fordham L. Rev.* 563 (2011)..................................................16

Esterl, Mike, "Jury Sides With Coca-Cola in False-Advertising Suit by Pom," *Wall Street Journal*, March 21, 2016.........................................................12

Halbrook, "Firearm Sound Moderators: Issues of Criminalization and the Second Amendment," 46 *Cumberland L. Rev.* 1 (2016)................................................20

## I. INTRODUCTION

The appellant, Hatchet Speed, herein replies to the government's Response Brief. The government's brief is mostly misdirection with a smattering of outright falsity, and a tiny dash of argument and substance. This honorable Court of Appeals should vacate Hatchet Speed's judgment and reverse Speed's convictions for the reasons stated in Speed's opening brief.

### A. The government misstates Speed's argument in its introduction.

On page 1 of the government's response brief, the government misstates Speed's arguments. "On appeal, Speed challenges his convictions on multiple grounds, most of which are premised on the theory that silencers must be operable to fall within § 5861(d)."

Speed most certainly does not make such an argument. Rather, Speed points out that 26 U.S.C. §5861(d) (and its associated subsections and definitions) require that silencers must be **either** (1) operable **or** (2) a "combination of parts" which could be readily assembled, without alteration, into operable silencers; and this is especially true where the "combination of parts" are sold and *marketed as functional goods of another type* (e.g., gun-cleaning

solvent containers). Speed's "silencers" fit neither description.

Moreover, the district court's jury instructions—which

overemphasized physical features of the devices while stressing that

the physical feature requirements of the law were very relaxed—

deprived Speed of due process and a fair trial. And the district

court's evidentiary rulings kept the jury from knowing Speed's _true,_

_innocent_, state of mind regarding the devices.

     Additionally, the government's brief misstates a number of

basic facts in evidence from the court below.  The government's

brief spins a false narrative:

>      Shortly after January 6, Speed began "panic
> buying" firearms. _Seeking to avoid_ the NFA and NFRTR,
> Speed purchased three devices from Hawk Innovative
> Tech. Although marketed as gun-cleaning accessories,
> these devices were in fact, _as Speed later admitted,_
> firearm silencers that _became fully operable with one_
> _simple modification._

United States Response Brief, p. 1 (emphasis added).

     Almost nothing in these three sentences accurately describes

the evidence in Speed's case.  Speed was an avid gun enthusiast

and veteran who owned many firearms and accessories. Rather

than "avoiding" the NFA and NFRTR, Speed had a track record of

*fully complying* with the requirements of the NFA and NFRTR. This plainly relevant, exculpatory evidence of Speed's track record and lack of criminal intent was wrongly hidden from the jury upon the district court's theory that such evidence was improper "mistake of law" evidence. (And in any case, mistake-of-law evidence is perfectly proper and admissible against the specific-intent crimes at issue here.)[1]

The District Court also precluded from trial Speed's frank discussions of the need to fill out ATF paperwork before drilling or modifying gun cleaning solvent traps in any way that made them into silencers. Had the jury known of Speed's *knowledge*, history, remarks, and *intent* regarding the NFRTR, the jury <u>would have acquitted Speed</u>.

Speed already knew the silencer-purchasing process (and the wait times) because he had previously purchased, registered, received (and waited for) a number of *actual* firearm silencers.

---

[1] The prosecution's theory here (that Speed's devices were admittedly not "firearm silencers" in the form possessed by Speed but that the devices somehow transmogrified into firearm silencers under Speed's specific future intent) made the offense a specific-intent crime.

Speed already owned and possessed *actual*, properly registered silencers that he could have used if he thought he 'needed silencers quickly.' But Speed's jury was deprived of knowing this.

The true record does not reflect any suggestion by Speed that Speed purchased the Hawk Innovative Tech containers *because* of frustration with the ATF's approval time regarding some of Speed's firearm silencer purchase orders.[2] The government was only able to argue such an inference because the jury was deceived and uninformed that Speed already possessed properly-registered silencers which were safely in his home at the time Speed purchased the Hawk Innovative Tech containers.

---

[2] An avid collector of high-quality guns and accessories, Speed first ordered three silencers from Silencer Shop on June 25, 2020, in the .300 caliber, to match his Daniel Defense DDM4 PDW pistol, which Speed ordered on June 23, 2020. Speed's ATF Form 4 registration application took seven months to process, and Speed picked up the three properly-registered silencers around February 2021. On Feb. 16, 2021, Speed ordered four additional silencers from Silencer Shop (two for .45 caliber; two for 9 mm). Speed properly registered, waited, and took possession of these four additional silencers on Feb. 4, 2022—*before Speed ever met and talked with undercover FBI Agent Al* (in March 2022). Speed's three Hawk Innovative Tech solvent traps had been sitting in their original boxes in Speed's storage unit *for a year* by that time.

The record is barren of any "admission" by Speed that his gun-cleaning accessories "were in fact, firearm silencers." Rather, Speed told the undercover FBI agent, "Al," that such devices *could be transformed* into firearm silencers in the event of a civil war or societal collapse; although Speed indicated he himself didn't even possess or know anyone with the tools required to make the transformations. Speed didn't even have any first-hand knowledge or experience with such transformations.

Nor did the evidence indicate the "firearm silencers" "became fully operable with one simple modification." The government's own expert witness, ATF officer Eisenbeise, conceded the modifications would require *at least* six (6) steps (she admitted *eight* (8) steps on cross-examination), including both removal of parts and the boring of the device with hardened metal-piercing drill bits.[3] On the witness stand, Eisenbeise communicated that such a modification operation would be easy. She claimed, for example, that a simple

---

[3] Although not well developed by either side in the trial, most drill bits commonly found in tool boxes and garage shelves are insufficient to bore through hardened metal casings such as the Hawk solvent traps. Such a conversion would require expensive metal drill bits.

power drill from Home Depot was all that was needed.  But

Eisenbeise admitted that she herself deployed the BATF's full

gunsmithing shop, *including threaded adaptors and an actual shop

vice*.  But curiously, and conveniently, the government introduced

no actual videos or photographs of Eisenbeise performing her

modifications.

## B. The government's false depiction of Speed's imaginative end-of-civilization hyperbole.

In the grand tradition of many contrived undercover FBI sting

operations of the past, undercover FBI Agent Al repeatedly

prompted Speed to ruminate regarding the plight of freedom,

Christianity, and manliness in modern America.  In response,

Speed pontificated upon such matters as vaccination conspiracies,

religion, Christians and Jews, stolen elections, the tumultuous

events of January 6, 2021, and the 1996 Olympic park bombing.

Inevitably, such discussions led to imagining life after a societal

collapse or civil war.  During an April 7, 2022 conversation, Al

asked Speed the **entirely leading question**, "You think *at that point

your…solvent traps would come in handy?*"  Speed replied, "Yeah,

that's the idea."  JA1232 (emphasis by italics added).

Such conjecture is entirely irrelevant to this case.  It merely highlights the entirely conditional nature of Speed's assessments regarding converting solvent containers into firearm silencers. Speed's awareness that the containers *could be* transformed into firearm silencers is <u>not</u> "knowledge" that the devices *were* firearm silencers.  Especially given Speed's frank discussions regarding the need to fill out BATF paperwork before making any such transformations—discussions which were hidden from the jury by the district court.

**C.     Under the government's theory, <u>any household item</u> could be designated a firearm silencer—and the possession of such a household item could subject its possessor to imprisonment.**

Speed's convictions are preposterous in light of the fact that almost any household object, such as a toaster, a blender, an ashtray, an alarm clock, a can opener, or a pencil sharpener, could be transformed into a "firearm silencer" with sufficient tooling or alteration. *Popular Mechanics* and *Mother Earth News* magazines are filled with articles discussing how to convert one type of product into another type of good.

The government's overreach in Speed's case is more extreme than in any previous published case, including prior cases regarding whether an object is a **muzzle brake,[4] compensator,[5] or flash suppressor**[6] (all of which can look similar and even share many or most of the same features of silencers).[7]  In Speed's case, Speed's devices <u>functioned</u> as gun-cleaning solvent traps but <u>did not function</u> as silencers. (Counsel knows of no other published federal "silencer" prosecution where this was true.)

The Government expert admitted that the solvent traps' "extraneous parts" (i.e., filters) "serve no function in a silencer but were attached to the devices by the manufacturer to "make an

---

[4] A muzzle brake is a device attached to the muzzle (exit end) of a gun barrel to reduce perceived recoil and barrel 'bounce' that occurs when the gun is fired. *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 288 n.1 (5th Cir. 2004).

[5] A compensator is a device attached to the muzzle end of the barrel that utilizes propelling gases to reduce recoil.  *See United States v. Syverson*, 90 F.3d 227, 232 (7th Cir. 1996) (item "would not have done much, if anything, to reduce the recoil of a firearm," but it "did reduce the report of a pistol, albeit slightly").

[6]"A flash suppressor is a muzzle attachment designed to reduce visible muzzle flash. *See United States v. Klebig*, 600 F.3d 700, 719 (7th Cir. 2009) (issue of whether the defendant "intended to use the oil filter that was taped to the barrel of a long gun as a silencer rather than as a flash suppressor").

[7]

excuse for making a claim" that the devices functioned as solvent filters. Odd testimony to say the least.

Federal case law is filled with "mislabeling" cases. And although not precisely apposite, these mislabeling cases generally hold that manufacturers of products which function as advertised— even if functioning poorly or poorly designed—are protected by free market principles. This is true even where "experts" claim the products would be more accurately described in other ways. Coca-Cola, for example, produces a "pomegranate-blueberry Juice" that is, in reality, composed of 99.4% apple and grape juices. But the product's tiny amount of pomegranate and blueberry juices qualify the product as "pomegranate/blueberry juice drink." *Cf*, Mike Esterl, "Jury Sides With Coca-Cola in False-Advertising Suit by Pom," *Wall Street Journal*, March 21, 2016 (https://www.wsj.com/articles/jury-sides-with-coca-cola-in-false-advertising-suit-by-pom-1458605039?msockid=3e27055c472569800ec416bb4647680c )gho (accessed 6/22/2025) (reporting California jury unanimously rejected mislabeling claim that the labeling of Coca-Cola's

pomegranate-blueberry juice blend (which did comply with FDA

labeling requirements) was either misleading or unfair competition,

ending eight years of litigation.

Many marketed products are well known to have auxiliary

uses during emergencies, shortages or wartime. The artificial

intelligence source "Grok" provides several examples of goods that

can be repurposed for alternative uses during emergencies.[8] The list

includes duct tape, trash bags, socks, cooking oil, and other

products:

- **Aluminum Foil**

  Emergency Use: Signal mirror for rescue, improvised
  cooking vessel, or to create a Faraday cage to protect
  electronics from EMPs. Can also reflect heat to keep
  warm.

- **Paracord (Parachute Cord)**

  Emergency Use: Tourniquet, fishing line, suture
  material (inner strands), or for building shelters and
  traps. Can also be used to secure gear or create a sling.

- **Plastic Bottles**

  Emergency Use: Water storage, solar water purifier
  (using UV rays), flotation device, or cut into tools (e.g.,
  a scoop or funnel). Can also be used to create a fish
  trap.

- **Food-Grade Plastic Buckets**

---

[8] Grok search request by undersigned counsel, June 15, 2025.

Emergency Repurposing: Water collection and purification, makeshift toilet, or container for foraging and carrying essentials.

A consumer might well purchase plastic buckets or plastic bottles while *knowing* that such buckets and bottles *could* be converted for use as illegal fish traps or as illegal toilets. Such a dual use potential is hardly a "loophole in the law" as the district court accused Speed of believing in. No one should face criminal prosecution for possessing illegal fish traps or illegal toilets if he does not begin intentionally converting his buckets or bottles into fish traps or toilets.

And in Speed's case, such a prosecution scenario is even more outrageous than the examples above. Speed's solvent devices (1) literally came with inserts explicitly saying the devices were particulate filters and solvent traps. (2) The devices *functioned as* particulate filters and solvent traps. (3) Nothing in the packaging or labeling of the devices suggested the devices were secret silencers.[9]

_____

[9] The government makes much of the fact that the containers had tiny engraved holes in the center of their bottoms. Nothing indicated anything other than an ornamental design purpose for such engravings (and such engraved divots and ornamentation are common in pots, pans, and containers. There were no engraved words such as "drill here." Nor were there any paper instructions

(4) The devices would have required several steps and actual mechanical alteration to become "unregistered firearm silencers." Further, Speed had (5) no present *ability* to convert the gun-cleaning accessories into firearm silencers, (6) no *tools* for converting the accessories into firearm silencers, and (7) no plan or intent to acquire such necessary tools. Speed also had (8) no history, direct observation or hands-on knowledge regarding converting such things into firearm silencers. Indeed, Speed (9) never expressed any intent to modify or convert the devices into firearm silencers; Speed's only remarks on the subject were both hypothetical and conditional—in response to an undercover agent's queries. In fact, Speed's remarks about "the idea" of the devices being transformed into silencers were based on a post-apocalyptic fantasy in which such devices *could be* converted into firearm silencers.

**D. The NFA's "destructive device" case law also discredits the District Court's construction.**

---

mentioning that the products can be converted to firearm silencers; or how one might make such conversions.

Not only does the case law on silencers disagree with Judge Nachmanoff's near-strict-liability rulings.  But the case law on "destructive devices"—a larger body of case law relating to a sister subsection[10]—also discredits the District Court's rulings. The NFA's "destructive device" definition is something of a corollary to the silencer definition, defining a "destructive device" as "(A) any explosive, incendiary, or poison gas . . . by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and . . . (C) any combination of parts <u>either designed or intended</u> for use in converting any device into any destructive device . . . and from which a destructive device may be readily assembled" (emphasis added).  Like the silencer definition, the destructive device definition is a gobbledygook mixture of terms and design features combined

---

[10] 26 U.S. Code § 5845(f) ("The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; . . . and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled").

with some specific-intent provisions regarding some of its permutations.

Elliot Buckman summed up the vast set of precedents and their different rulings regarding criminal intent to possess a "destructive device" in a 2011 article, *"Just a Soul Whose Intentions Are Good? The Relevance of a Defendant's Subjective Intent in Defining a "Destructive Device" Under the National Firearms Act,"* 79 *Fordham L. Rev.* 563 (2011). Buckman concludes that "the most sound approach is that of the Second Circuit in *Posnjak*,[11] advocating a standard which looks primarily to an item's objective characteristics, but allows for consideration of subjective intent, specifically in cases of unassembled parts when an objective inquiry leaves open the possibilities of conversion into <u>either a proscribed or unproscribed device</u>." *Id.* at 603.

---

[11] *United States v. Posnjak*, 457 F.2d 1110, 1112 (2d Cir. 1972) involved a defendant convicted of selling 4100 unregistered sticks of dynamite, along with fuse and caps, to an undercover agent. Posnjak appealed, arguing that the statute does not proscribe commercial dynamite, regardless of the dynamite's purpose. The Second Circuit reversed the defendants' conviction, as it was based upon the sale of commercial dynamite, which otherwise does not fall under the statute. *Id.* at 1116, 1121.

Similarly, in *United States v. Hammond*, 371 F.3d 776 (11th Cir. 2004), the Eleventh Circuit stated that a device is not covered by the statute simply because it explodes. *Id.* at 780. Rather, the NFA requires proof that the device was designed as a weapon. The firearm in question was a cardboard tube filled with pyrodex, an explosive powder, and gunpowder, with a fuse. *Id.* The National Firearm Act focuses both on "design" (the mindset of the item's maker) and on "intent" (the mindset of the possessor). *Hammond*, 371 F.3d at 780. *Cf also United States v. Fredman*, 833 F.2d 837 (9th Cir. 1987) (holding that commercial dynamite, absent some proof of intent for use as a weapon, cannot qualify as a destructive device under section 5845(f); *United States v. Copus*, 93 F.3d 269 (7th Cir. 1996) (saying it is "undisputed" that a defendant's intent is relevant in determining whether a combination of parts may be labeled a destructive device. However, because Copus's detonators were fully assembled devices, the court applied section 5845(f)(1), which covers "bomb[s]" or "similar device[s]" and which does not contain an intent provision).

## II. THE FIFTH CIRCUIT RECENTLY WITHDREW A PRO-GOVERNMENT RULING REGARDING SILENCERS AND THE 2ND AMENDMENT

Finally, there are rapid developments in another federal court of appeals regarding the Second Amendment's protection of firearm silencer possession. Just days ago (June 17), in the case of *United States v. Peterson* (24-30043), the U.S. Fifth Circuit withdrew its previous order upholding a firearm-silencer conviction in a Second Amendment appeal. See COURT DIRECTIVE ISSUED (filing #141) in the *Peterson* case (attached).



This case is closely watched by Second Amendment experts. Just prior to this recent (withdrawal) order, more than a dozen gun rights organizations supported *amicus* briefs arguing that the Second Amendment to the Constitution protects ownership and possession of firearm silencers. The withdrawn (3-judge) opinion *had* upheld Mr. Peterson's Eastern-District-of-Louisiana conviction for silencer possession against Peterson's 2nd-amendment challenge.

While it is too early to tell, it appears that the 5th Circuit may be poised to issue an *en banc* ruling that silencer possession <u>is protected by the Second Amendment</u>.

Although pre-*Bruen* case law did generally reject 2nd-amendment challenges in suppressor-possession cases, the Supreme Court's landmark *New York State Rifle & Pistol Association, Inc. v. Bruen* case, 597 U.S. 1 (2022), fundamentally upset such prior case law.

According to scholar and historian Stephen P. Halbrook, the inclusion of silencers in the original National Firearm Act regulations seems to have been an afterthought without much support in any data, research or commentary of the period. See Halbrook, "Firearm Sound Moderators: Issues of Criminalization and the Second Amendment," 46 *Cumberland L. Rev.* 1 (2016).

### III. CONCLUSION

Appellant Hatchet Speed was wrongly convicted of possessing three unregistered firearm silencers. In Speed's case, a focus on **either** the devices' design **or** Speed's knowledge and intent regarding the devices ends the analysis. Not only were the three

devices not firearm silencers; but Speed would not have been convicted if the jury had been aware of Speed's history and the evidence of Speed's lack of criminal intent. The District Court wrongly construed the law and abused its discretion in precluding evidence that Speed already owned and registered several lawful firearm silencers and that Speed had no intent to convert his three containers into silencers, lest he become a "felon."

ACCORDINGLY, appellant Hatchet M. Speed requests that this honorable Court of Appeals overturn and vacate his convictions, and remand this case to the district court for dismissal or a new trial.

Respectfully submitted,
/s/ *Roger Roots*
Roger Roots
10 Dorrance Street, Suite #700
Providence, RI 02903
775-764-9347
Email: roger@rootsjustice.com
Counsel for Appellant Hatchet Speed

**CERTIFICATE OF SERVICE**
I Roger I. Roots, esq., certify that a copy of the foregoing filing is being served electronically on all parties registered with the Court's ECF system in this case.

/s/ Roger I. Roots                June 23, 2025

**CERTIFICATE OF WORD COUNT COMPLIANCE**

I, Roger I. Roots, esq., also certify that this document contains some 3,700 words, thus complying with this Court's word count limitations for a reply brief.

/s/ Roger Roots