IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 23-4308

———————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

HATCHET M. SPEED,

*Appellant*.

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Alexandria
*The Honorable Michael S. Nachmanoff, District Judge*

———————————

SUPPLEMENTAL BRIEF OF THE UNITED STATES

———————————

Lindsey Halligan                    Brian J. Samuels
United States Attorney              Assistant United States Attorney
                                    2100 Jamieson Avenue
                                    Alexandria, Virginia 22314
                                    (703) 299-3700

*Attorneys for the United States of America*

## Table of Contents

**Page**

Table of Authorities .................................................................. ii

Introduction ...........................................................................1

Argument.................................................................................2

I.    Regulations on firearm suppressors burden the right protected by the Second Amendment................................................................2

II.    The National Firearms Act's restrictions on suppressor possession comply with the Second Amendment.............................................5

Conclusion ..........................................................................13

Statement Regarding Oral Argument .......................................15

Certificate of Compliance .......................................................15

i

## Table of Authorities

Page

**Cases**

*Andrews v. State*, 50 Tenn. 165 (1871) ........................................................3

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc) ......................7

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................4, 7

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)...............9

*Hill v. Colorado,* 530 U.S. 703 (2000) .......................................................3

*Luis v. United States*, 578 U.S. 5 (2016)....................................................3

*Md. Shall Issue, Inc. v. Moore*,
    116 F.4th 211 (4th Cir. 2024) (en banc).............................................10

*Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983)............................................................................3

*Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) .........................................4

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ........... passim

*United States v. Miller*, 307 U.S. 174 (1939) ............................................4

*United States v. Peterson*, 150 F.4th 644 (5th Cir. 2025)................. passim

*United States v. Rahimi*, 602 U.S. 680 (2024).......................... 6, 7, 9, 13

*United States v. Saleem*, No. 23-4693,
    2024 WL 5084523 (4th Cir. Dec. 12, 2024) (per curiam).................3

**Statutes**

18 U.S.C. § 922(t) ......................................................................................12

26 U.S.C. § 5811 .........................................................................................6

26 U.S.C. § 5812(a) .....................................................................................6

26 U.S.C. § 5822 .........................................................................................6

26 U.S.C. § 5841 .........................................................................................6

26 U.S.C. § 5861(d) .............................................................................1, 11

ii

## Other Authorities

Congressional Sportsmen's Foundation, *Firearm Suppressors*,
https://congressionalsportsmen.org/policy/firearm-suppressors/ ...................6

Connecticut Office of Legislative Research, *Gun Permit and License Fees*, https://www.cga.ct.gov/2017/rpt/pdf/2017-R-0066.pdf ......................16

Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381 (2025)...................................8

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223 (2024) ......................................9

Exec. Order No. 14206, Protecting Second Amendment Rights,
90 Fed. Reg. 9503 (Feb. 7, 2025) ..................................................................2

Lisa Marie Pane, *Did 'Silencer' Make a Difference in Virginia Beach Carnage?*, KRON4 (June 1, 2019),
https://www.kron4.com/news/national/did-gunmans-silencer-make-adifference-in-the-carnage/.................................................................10

Marines.mil, *Marine Corps Begins Widespread Fielding of Suppressors*, https://www.marines.mil/News/News-Display/Article/2459549/marine-corps-beginswidespread-fielding-of-suppressors/ ..........................................................6

Michael Stewart et al., Nat'l Hearing Conservation Ass'n,
*NHCA Position Statement:Recreational Firearm Noise* (Mar. 16, 2017),
https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf.................................................................5

Savage Arms, *How Suppressors Work To Reduce Noise and Recoil*,
https://savagearms.com/blog/post/how-suppressors-work-to-reduce-noise-and-recoil ..............................................................6

Silencer Central, *How Much Does a Suppressor Cost?*,
https://www.silencercentral.com/blog/how-much-does-a-suppressor-cost/ ..............................................................15

iii

The Police Foundation, *Police Under Attack: Southern California
Law Enforcement Response to the Attacks by Christopher
Dorner*, https://www.policinginstitute.org/wp-
content/uploads/2015/07/Police-Under-Attack.pdf......................................10

U.S. Dep't of Justice, Press Release, *Luigi Mangione Charged with
the Stalking and Murder of UnitedHealthcare CEO Brian
Thompson and Use of a Silencer in a Crime of Violence* (Dec.
19, 2024), https://www.justice.gov/archives/opa/pr/luigi-
mangione-chargedstalking-and-murder-unitedhealthcare-ceo-
brian-thompson-and-use ...............................................................11

William Baude & Robert Leider, *The General-Law Right to Bear
Arms*, 99 Notre Dame L. Rev. 1467 (2024) ....................................8

Wilt Johnson & Bill Hutchinson, *Suspected Virginia Beach Shooter
Used Legally-Bought Gun Suppressor*, ABC News
(June 4, 2019), https://abcnews.go.com/US/suspectedvirginia-
beach-gunman-resigned-personal-reasons-
massacre/story?id=63449625 .......................................................11

**Treatises**

Thomas Cooley, *Treatise on Constitutional Limitations* (1868).............................4

**Constitutional Provisions**

U.S. Const. amend. II................................................................................2

**Introduction**

The National Firearms Act, 26 U.S.C. § 5801 et seq. (the "NFA"), establishes a comprehensive framework governing, among other things, the possession, transfer, and registration of firearms. As relevant here, 26 U.S.C. § 5861(d) prohibits any individual from receiving or possessing a firearm which is not registered to him in the National Firearms Registration and Transfer Record (the "NFTR"). A jury found Hatchet Speed guilty of three counts of possessing unregistered firearm suppressors. In this direct appeal, Speed argues, among other claims, that the NFA's prohibition on possessing unregistered suppressors violates the Second Amendment. *See* Def. Br. 48–51.

In its response brief, the United States argued that suppressors are not "bearable arms" protected by the Second Amendment. Gov't. Br. 47-48. The United States further argued that even if suppressors were "bearable arms," they constitute "dangerous and unusual weapons" such that the NFA's prohibition on their unregistered possession does not violate the Second Amendment. Gov't. Br. 48-49. Additionally, the United States maintained that the NFA's registration requirements do not "infringe" on any Second Amendment right. Gov't Br. 50–51. But even if they did, the United States argued, the NFA is consistent with the Nation's historical tradition of firearm regulation. Gov't. Br. 51–52.

This case is now fully briefed and calendared for oral argument on December 12, 2025. As part of its broader evaluation of its litigating positions in Second Amendment cases, *see* Exec. Order No. 14206, Protecting Second Amendment Rights, 90 Fed. Reg. 9503 (Feb. 7, 2025), the United States has re-evaluated its position in this case with respect to the nature of the devices at issue. In the view of the United States, the Second Amendment does protect firearm accessories and components such as suppressors. As a result, restrictions on the possession of suppressors burden the right to bear arms, and a ban on the possession of suppressors or other similar accessories would be unconstitutional. The government's earlier arguments to the contrary were incorrect. But, as also argued by the United States in its response brief, the NFA's registration and taxation requirement is constitutional because it imposes a modest burden on a firearm accessory that is consistent with this Nation's historical tradition.  Gov't. Br. 50-52.  The United States clarifies and explains its position herein.

## Argument

## I.    Regulations on firearm suppressors burden the right protected by the Second Amendment.

The Second Amendment protects the "right to keep and bear Arms." U.S. Const. amend. II. Regardless of whether suppressors themselves constitute "arms," restrictions on suppressors burden the right to "keep and bear Arms" and so must be closely scrutinized to ensure compliance with the Second Amendment. The United

States recognizes that this Court has rejected, in an unpublished, nonprecedential opinion, the proposition that suppressors are "arms" or "reasonably necessary accoutrements" within the scope of Second Amendment protection. *United States v. Saleem*, No. 23-4693, 2024 WL 5084523, at *2 (4th Cir. Dec. 12, 2024) (per curiam). Nonetheless, the United States seeks to preserve its position that suppressors are within the Second Amendment's ambit.

"Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring in judgment). In the First Amendment context, for example, a tax on ink and paper burdens the freedom of the press. *Minn. Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582 (1983). As Justice Scalia observed, "[t]here comes a point . . . at which the regulation of action intimately and unavoidably connected with traditional speech is a regulation of speech itself." *Hill v. Colorado,* 530 U.S. 703, 745 (2000) (Scalia, J., dissenting).

So too, in the Second Amendment context, "[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews v. State*, 50 Tenn. 165, 178 (1871). Although none of these activities literally involves the "keep[ing]" of "arms," each activity is a fundamental component of the right protected by the Second Amendment. *See United States v.*

*Miller*, 307 U.S. 174, 180 (1939) ("The possession of arms also implied the possession of ammunition . . . ." (quotation omitted)). The right to bear arms similarly "implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use." *District of Columbia v. Heller*, 554 U.S. 570, 618 (2008) (quoting Thomas Cooley, *Treatise on Constitutional Limitations* 271 (1868)). And the right extends to firearm accessories that are useful to the exercise of the right. *See Mock v. Garland*, 75 F.4th 563, 588 (5th Cir. 2023) (Willett, J., concurring) ("[P]rotected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms.").

"Many commentators have recognized the benefits of suppressors." *United States v. Peterson*, 150 F.4th 644, 648 (5th Cir. 2025). Most importantly, suppressors limit the noise caused by firearms, reducing a firearm's audible muzzle blast by up to 30 decibels.[1] This noise reduction helps shooters avoid permanent hearing damage and facilitates communication with others when engaging in both civilian self-defense and public defense. Indeed, because of the hearing-related benefits of

---

[1] Michael Stewart et al., Nat'l Hearing Conservation Ass'n, *NHCA Position Statement:Recreational Firearm Noise* 5 (Mar. 16, 2017), https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf.

suppressors, the U.S. Marine Corps began issuing them to infantry units in 2020.[2] Suppressors appear to improve accuracy and aid in target re-acquisition by reducing recoil and muzzle rise.[3] And suppressors aid in target shooting—an activity protected by the Second Amendment—by reducing noise pollution and providing additional hearing protection beyond personal protective equipment. All these practical benefits demonstrate that suppressors facilitate the constitutional right to keep and bear arms. Accordingly, restrictions on suppressors impose a burden on using firearms that implicates the Second Amendment. *See Peterson*, 150 F.4th at 652 (assuming, without deciding, "that suppressors constitute 'arms' under the Second Amendment").

## II.  The NFA's restrictions on suppressor possession comply with the Second Amendment.

Although the NFA's restrictions on suppressor possession implicate the right to bear arms, the modest burden they impose does not violate the Second Amendment. Under the NFA, every suppressor must be registered to its possessor

---

[2] Marines.mil, *Marine Corps Begins Widespread Fielding of Suppressors*, https://www.marines.mil/News/News-Display/Article/2459549/marine-corps-beginswidespread-fielding-of-suppressors/.

[3] *See* Savage Arms, *How Suppressors Work To Reduce Noise and Recoil*, https://savagearms.com/blog/post/how-suppressors-work-to-reduce-noise-and-recoil; Congressional Sportsmen's Foundation, *Firearm Suppressors*, https://congressionalsportsmen.org/policy/firearm-suppressors/.

in the NFRTR. 26 U.S.C. § 5841. As a condition of registration, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) confirms that the transferee is eligible to possess the device under federal, state, and local law. *See* 26 U.S.C. §§ 5812(a), 5822. And the person acquiring the suppressor must pay a $200 tax. 26 U.S.C. § 5811. Although a total ban on suppressors or other similar accessories would be unconstitutional, the NFA's modest regulations pass muster.

When the government regulates the right to keep and bear arms, it bears the burden of showing that the challenged regulation is "consistent with the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). That is a rigorous test, not a "regulatory blank check." *Id.* at 30. "Why and how the regulation burdens the right are central to this inquiry." *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

Even if the government can identify a specific historical analogue for a statute, the statute must comply with the broader "principles that underpin [the Nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692. The founding generation distinguished between a valid regulation and an impermissible "infringement" of the right to keep and bear arms. *See* Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381, 382-87 (2025). A restriction could amount to an unconstitutional infringement if (among other reasons) it served an illegitimate purpose, burdened the right more severely than necessary to serve a valid purpose, or broadly negated the right. *See*

William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1489 (2024).

Our Nation's regulatory tradition shows that the Second Amendment does not guarantee an "unlimited" right "to keep and carry any weapon whatsoever." *Heller*, 554 U.S. at 626. For example, American legislatures have long "prohibited the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 47 (citation omitted); *see Heller*, 554 U.S. at 627; *Bianchi v. Brown*, 111 F.4th 438, 450 (4th Cir. 2024) (en banc).

Particularly relevant here, American legislatures have also traditionally imposed special taxes on arms that are especially susceptible to criminal misuse. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 227 (2024). For instance, many 19th-century legislatures taxed weapons such as dueling pistols, sword canes, Bowie knives, Arkansas toothpicks, and dirks. *See id.* at 293-328 (collecting statutes); *see also Bianchi*, 111 F.4th at 466–67.

The NFA's restrictions on suppressors are "'relevantly similar'" to those historical laws in "why" they burden the right to bear arms. *Rahimi*, 602 U.S. at 698 (citation omitted). Suppressors (which do not fully silence a firearm) are susceptible to criminal misuse because they make it harder for law enforcement to identify or detect the source and direction of gunfire, such as in drive-by or mass shootings or

assassination attempts.[4] This is not to say that suppressors are widely used for criminal purposes—their beneficial use is overwhelming in relation to their criminal use—but they do present a niche case for criminal use. For example, Christopher Dorner in 2013 used suppressed weapons to murder two people in a populated area and later to shoot at police officers without revealing his position.[5] DeWayne Craddock used a suppressor during a mass shooting at a Virginia Beach Municipal Center.[6] And Luigi Mangione is alleged to have used a suppressor in the killing of an insurance executive on a busy New York City street.[7]  Thus, while suppressors

---

[4] *See* Lisa Marie Pane, *Did 'Silencer' Make a Difference in Virginia Beach Carnage?*, KRON4 (June 1, 2019), https://www.kron4.com/news/national/did-gunmans-silencer-make-adifference-in-the-carnage/ (quoting former ATF agent's observation that "a suppressor will distort the sound in such a way that it would not immediately be recognizable as gunfire").

[5] The Police Foundation, *Police Under Attack: Southern California Law Enforcement Response to the Attacks by Christopher Dorner* 14, 20, 35-36, https://www.policinginstitute.org/wp-content/uploads/2015/07/Police-Under-Attack.pdf.

[6] Wilt Johnson & Bill Hutchinson, *Suspected Virginia Beach Shooter Used Legally-Bought Gun Suppressor*, ABC News (June 4, 2019), https://abcnews.go.com/US/suspectedvirginia-beach-gunman-resigned-personal-reasons-massacre/story?id=63449625.

[7] *See* U.S. Dep't of Justice, Press Release, *Luigi Mangione Charged with the Stalking and Murder of UnitedHealthcare CEO Brian Thompson and Use of a Silencer in a Crime of Violence* (Dec. 19, 2024), https://www.justice.gov/archives/opa/pr/luigi-mangione-chargedstalking-and-murder-unitedhealthcare-ceo-brian-thompson-and-use.

are beneficial to the exercise of Second Amendment rights, they are also specially adaptable to criminal misuse beyond the mere fact that all weapons (and thus all accessories) can be used in the commission of a crime—a fact that was accounted for in the policy choice made by the People when they adopted the Second Amendment.[8]

The NFA's restrictions on suppressors also resemble historical laws in "how" they burden the right to bear arms. *Rahimi*, 602 U.S. at 698. The NFA imposes only a minor burden on the right of armed self-defense. It regulates a nonessential firearm accessory, so the burden on the Second Amendment is less severe than a taxation or registration requirement applicable to weapons or essential components themselves. And the NFA does not ban suppressor possession; rather, it requires only registration, payment of a modest tax, and a background check. Those burdens are comparable to the burdens imposed by historical laws taxing weapons that pose a special danger of misuse.

---

[8] Because ordinary firearms, unlike suppressors, are not peculiarly susceptible of criminal misuse, registration laws or taxes targeting such firearms likely would not serve or be proportionate to any legitimate public-safety purpose. *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("requir[ing] registration of individual guns" generally does not serve any legitimate purpose and is usually "aimed at deterring gun ownership"). In addition, a law regulating or taxing the firearm itself would impose a more severe burden on the right to keep and bear arms than regulations on useful but non-essential accessories such as suppressors.

The Supreme Court has determined that other similarly modest burdens are consistent with the Second Amendment. For example, in invaliding a New York law requiring a "special need" to obtain a firearm-carry license, *Bruen* made clear that it was not calling into question the constitutionality of the "shall-issue" licensing regimes in 43 states, which issued permits based on the general desire for self-defense. *Bruen*, 597 U.S. at 38 n.9. The Supreme Court explained that these schemes, "which often require applicants to undergo a background check or pass a firearms safety course," are permissible so long as "lengthy wait times" or "exorbitant fees" do not "deny ordinary citizens their right to public carry." *Id.*

This Court applied "*Bruen*'s clear guidance on 'shall-issue' licensing laws" to uphold a state handgun qualification statute against a facial Second Amendment challenge. *See Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024) (en banc). The statute fell "within the scope of 'shall-issue' licensing laws that the Supreme Court has indicated are presumptively constitutional." *Id.* at 225. And the challengers failed to show that the temporary delay resulting from compliance with the statute, the wait time for obtaining a license, or a separate law requiring another background check infringed the Second Amendment right. *Id.* at 226–29.

As Speed notes in his reply brief (at 19), the Fifth Circuit recently considered a similar Second Amendment challenge to the NFA's suppressor-registration requirement. *See United States v. Peterson*, 150 F.4th 644, 650 (5th Cir. 2025). In

*Peterson*, as here, the defendant did not purchase the fully completed suppression device from a manufacturer. *Id.* at 647. Instead, he acquired materials and a kit to make it himself. *Id.* Like Speed, the defendant had not registered the device in the NFTR. *Id.*

The Fifth Circuit determined that "the NFA suppressor-licensing scheme is presumptively constitutional because it is a shall-issue licensing regime." *Id.* at 652. The NFA contains "precisely the 'objective[ ] and definite' licensing criterion held permissible under *Bruen*." *Id.* (quoting *Bruen*, 597 U.S. at 38 n.9). And "the NFA enforces its objective shall-issue licensing requirement through prohibiting suppressor possession by unlicensed persons, 26 U.S.C. § 5861(d), as did several of the 'shall-issue' licensing regimes that *Bruen* cited approvingly." *Id.* (citing *Bruen*, 597 U.S. at 13 n.1, 38 n.9).

The Fifth Circuit went on to conclude that the defendant could not overcome the presumption of constitutionality "because the record [did] not reveal that the NFA ha[d] effectively den[ied] him his Second Amendment rights." *Id.* at 654 (quoting *Bruen*, 597 U.S. at 38 n.9). The defendant did not pay the tax or claim that the tax or other application requirements discouraged him from submitting an application to the ATF. *Id.* at 653. Because the defendant 'simply forgot to do the paperwork after' he made the suppressor," the record was "devoid of any facts indicating that the NFA ha[d] been 'put toward abusive ends' as applied to him." *Id.*

11

Additionally, "Peterson's unsupported claim that applicants must wait eight months on average before they can obtain a suppressor [was] insufficient to overcome *Bruen*'s presumption." *Id.*

In the same way, here, Speed cannot rebut the NFA's presumption of constitutionality. The NFA's $200 transfer tax for suppressors is neither "exorbitant," nor does it deny ordinary citizens the ability to possess and use a suppressor—much less a firearm. *See Peterson*, 150 F.4th at 653 n.3. The $200 fee is generally less than the cost of a suppressor itself, which can range from $350 to $1,500.[9] And the fee is not disproportionate to the licensing fees charged by shall-issue states, which ranged from around $10 to $140 in 2017.[10] The NFA's requirements are no more burdensome than a variety of other constitutional regulations, such as the requirements that a firearm purchaser obtain a background check, *see* 18 U.S.C. § 922(t); or that a person licensed to carry a firearm undergo safety training and pay a reasonable fee, *see Bruen*, 597 U.S. at 13 n.1, 38 n.9. As discussed above, history and tradition permit Congress to impose modest regulations

---

[9] *See* Silencer Central, *How Much Does a Suppressor Cost?*, https://www.silencercentral.com/blog/how-much-does-a-suppressor-cost/.

[10] *See* Connecticut Office of Legislative Research, *Gun Permit and License Fees*, https://www.cga.ct.gov/2017/rpt/pdf/2017-R-0066.pdf.

on suppressors. The NFA does not prohibit possession of suppressors. It requires only registration, a background check, and a $200 tax that is not indexed to inflation.

The NFA's restrictions on suppressors are also consistent with the broader "principles that underpin [the Nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692; *see Peterson*, 150 F.4th at 654 n.5 (not reaching this issue but collecting cases holding that the NFA's suppressor-registration requirements satisfy *Bruen*'s second step). The restrictions serve the legitimate purpose of regulating nonessential firearm components that are particularly susceptible to criminal misuse; they are not pretextual provisions that seek simply to inhibit the exercise of constitutional rights; and the restriction involved is a modest tax, not a prohibition or other regulation that could "broadly restrict arms use by the public generally." *Rahimi*, 602 U.S. at 698. While a complete ban on suppressors would be unconstitutional, the NFA's restrictions comply with the Second Amendment.

## Conclusion

For the foregoing reasons and those stated in the government's response brief, the Court should affirm Speed's convictions.

Respectfully submitted,

Lindsey Halligan
United States Attorney

_____/s/_____

Brian J. Samuels
Assistant United States Attorney

14

**Statement Regarding Oral Argument**

The Court has calendared this case for oral argument on December 12, 2025.

**Certificate of Compliance**

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word.

I further certify that this brief does not exceed 13,000 words (and is specifically 2911 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/
_____

Brian J. Samuels
Assistant United States Attorney